## PEOPLE v. MILES et al.

(Supreme Court, Appellate Division, Second Department. January 17, 1908.)

1. CONSPIRACY—EVIDENCE—SUFFICIENCY.

Evidence *held* to prove a conspiracy to defraud a city by procuring the presentation and allowance of fraudulent claims against it.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, §§ 105–107.]

2. SAME—EVIDENCE—CIRCUMSTANTIAL EVIDENCE.

A conspiracy may be proved by circumstantial evidence.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, § 106.]

3. SAME.

To prove that one is a party to a conspiracy, it is not necessary to show that he took part in every act or was actually cognizant of every act done in furtherance of the conspiracy; conspiracy implying concert of design, and not participation in every detail of execution.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, §§ 33, 76, 77.]

4. SAME.

Evidence held to show that persons were parties to a conspiracy to defraud a city by the presentation and allowance of fraudulent claims against it.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, §§ 105, 106.]

5. FALSE PRETENSES—FRAUDULENT PRESENTATION OF CLAIM TO PUBLIC OFFICER—"OFFICER."

The word "officer," in Pen. Code, § 672, punishing one who with intent to defraud presents for allowance or payment to any officer of any city, authorized to audit, allow, or pay bills, fraudulent claims, includes the comptroller of the city of New York, authorized by Greater New York Charter, Laws 1901, p. 50, c. 466, § 149, to adjust claims against the city.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 6, pp. 4933–4951; vol. 8, p. 7737.]

6. CONSPIRACY—INDICTMENT—SUFFICIENCY—"CHEAT."

Under Code Cr. Proc. §§ 275, 276, providing that an indictment shall contain a concise statement of the act constituting the crime, etc., and prescribing the form of indictment, an indictment charging that defendants conspired, by procuring the presentation and allowance of fraudulent claims against a city, to cheat and defraud the city, and alleging that, in pursuance of the conspiracy, defendants prepared in the name of a third person a false claim against the city and procured the allowance of the same, etc., charges a violation of Pen. Code, § 168, providing that where two or more persons conspire to cheat another out of property by any means which are in themselves criminal, or which if executed would amount to a cheat, they shall be guilty of a misdemeanor; since the means alleged were of a felonious character within the purview of the section, and were such as if executed would amount to a cheat, which

is such a fraud as will affect the public, such a deception that common prudence and care are not sufficient to guard against it.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, § 97. For other definitions, see Words and Phrases, vol. 2, pp. 1107–1109.]

**7. SAME—COMBINATION TO INJURE PUBLIC.**

Conspiracies to cheat a state or county or city are indictable as a combination to injure the public.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, § 60.]

**8. SAME.**

An indictment charging that defendants conspired, by procuring the presentation and allowance of fraudulent claims against a city, to defraud the city, and alleging that defendants prepared in the name of a third person a false and fraudulent claim against the city for damages to property, and procured the allowance and payment of the same with intent to defraud the city, sufficiently sets forth the means to carry out the conspiracy; it not being necessary to set forth all of the steps in the procurement of the false claim or the allowance and payment thereof.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, §§ 85, 97.]

**9. INDICTMENT—ALLEGATIONS—SUFFICIENCY.**

An indictment which states the nature and purpose of the conspiracy charged in terms sufficiently clear and specific to enable defendants to prepare for trial, and to bar another trial on the same charge, is sufficient.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Indictment and Information, § 193.]

**10. CONSPIRACY—OVERT ACT.**

Under Pen. Code, § 171, providing that no agreement except to commit a felony on the person of another, or to commit arson or burglary, amounts to a conspiracy, unless "some act besides such agreement" be done to effect the object thereof by one or more of the parties to the agreement, the act to be done is one to accomplish the object of the conspiracy.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, §§ 38, 39.]

**11. SAME—INDICTMENT.**

An indictment charging that defendants conspired by procuring the allowance of fraudulent claims against a city to cheat and defraud the city, and alleging that, in pursuance of the conspiracy, defendants prepared in the name of a third person false and fraudulent claims for damages to property, and procured the allowance and payment thereof, sufficiently charges an overt act within Pen. Code, § 171, providing that no agreement shall amount to a conspiracy, unless some act besides the agreement be done to effect the object thereof.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, § 89.]

**12. SAME—VARIANCE.**

An indictment charged defendants with conspiracy to defraud a city by procuring the presentation, allowance, and payment of fraudulent claims against it, and alleged that defendants prepared in the name of a third person false and fraudulent claims for injuries to personalty and realty, and procured the allowance and payment thereof. The evidence showed that the third person never signed the claim; that the jurat thereto was that of one of the conspirators; that the claim was solicited by the conspirators; that it was fraudulently increased by false items; and that it was filed by a co-conspirator as attorney. It appeared that the third person had sustained some damage to his property. *Held*, that there was no variance between the evidence and the indictment.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, § 90.]

**13. SAME—EVIDENCE—ACTS OF CONSPIRATORS—ADMISSIBILITY.**

It is competent to prove isolated acts as steps by which a conspiracy itself may be established.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, §§ 100–104.]

**14. SAME.**

On the issue whether there was a conspiracy on the part of defendants to defraud a city by procuring the making, presentation, and allowance of fraudulent claims against it, proof that some one or more of defendants procured claimants to make false claims, and that claimants never swore to the claims before some of the defendants whose names appeared on jurats annexed to their claims, was admissible as establishing the conspiracy.

**15. CRIMINAL LAW—TRIAL—ORDER OF PROOF—DISCRETION OF COURT.**

The order of proof in a criminal case is within the sound discretion of the court, and the court may admit the acts or declarations of alleged conspirators before proof of the conspiracy.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 1609.]

**16. CONSPIRACY—EVIDENCE—ADMISSIBILITY.**

Under Code Cr. Proc. § 275,. providing that an indictment shall contain a plain statement of the facts constituting the crime, and section 398, providing that on a trial for conspiracy, where an overt act is necessary to constitute the crime, the accused cannot be convicted unless one or more overt acts be expressly alleged in. the indictment and proved, on a trial for conspiracy to defraud a city by procuring the making, presentation, and allowance of fraudulent claims against it, evidence of the falsity or fraudulent character of claims not mentioned in the indictment, containing an allegation of the making, presentation, allowance, and payment of a false and fraudulent claim, is admissible.

**17. SAME.**

On' a trial for conspiracy to defraud a city by procuring the making, presentation, allowance, and payment of fraudulent claims against it, the admission of entries in a book in the comptroller's department of the city, charged with the duty of auditing claims, made by an officer of the department and a party to the conspiracy, was proper so far as they related to the fraudulent claims shown by the evidence as against the officer making the entries.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, § 102.]

**18. SAME.**

Where, on a trial for conspiracy to defraud a city by procuring the making, presentation, allowance, and payment of fraudulent claims against it, the prosecution showed a policy of favoritism in the allowance of claims which operated in favor of an attorney who was one of the conspirators, a book in the comptroller's department of the city, charged with the duty of auditing claims, made by an officer in the department and a party to the conspiracy, were admissible to show the attitude of the officer toward the claims of the attorney, compared with his attitude toward others.

**19. CRIMINAL LAW—EVIDENCE—ACCOUNT BOOK.**

Where a book of account is properly received in evidence, it is proper for the court to permit the report of one who examined the book.

**20. SAME.**

Where several defendants are charged with a conspiracy to defraud a city by procuring the making, presentation, allowance, and payment of fraudulent claims against it, some of the defendants may be convicted and others acquitted, though, where only two are indicted for conspiracy, one cannot be convicted and the other acquitted.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, §§ 33, 72.]

Rich, J., dissenting in part.

Appeal from Kings County Court.

William O. Miles and another were convicted of conspiracy, and they appeal. Affirmed.

The indictment charged these defendants, together with four others, with "wickedly devising and intending to cheat and defraud the city of New York out of its money and property, and to obtain money from the city of New York, at the county aforesaid, and within the jurisdiction of the said court, fraudulently, maliciously, and unlawfully did conspire, combine, confederate, and agree together, between and amongst themselves, by procuring certain and divers false and fraudulent bills and claims against said city, and certain and divers bills and claims against said city, containing false and fraudulent charges, items, and claims for damages pretended to have been sustained by many and various persons, late of said county mentioned in said bills and claims, through and by reason of the alleged negligent, careless, and inefficient manner in which said city and its officers, servants, and employés kept and maintained its system of sewers in said county, by reason whereof, as it was by said William O. Miles, Martin J. McMahon, John B. Scanlon, Frank Wandell, Jr., Charles M. Wells, and Daniel Casey, pretended and falsely represented various and divers of such sewers from time to time overflowed and failed to carry off the surface water in the streets of said borough and county that fell during many and divers severe rainstorms, thereby causing and permitting such water to flow into the cellars, rooms, and houses of the said many and various persons named and mentioned in said bills and claims, as aforesaid, injuring, doing damage to, and destroying, as by said William O. Miles, Martin J. McMahon, John B. Scanlon, Frank M. Wandell, Jr., Charles M. Wells, and Daniel Casey, it was pretended and falsely represented the goods, chattels, real property, and personal property of said persons mentioned in said bill and claims as aforesaid to be audited, allowed, and paid by the comptroller of the said city, unlawfully to cheat, and defraud the city of New York out of its money and property, and to obtain the money and property of the city of New York. And the grand jury, as aforesaid, do further present that the said defendants, together with said other evil disposed persons, in execution of the said last-mentioned premises, and in pursuance of the said conspiracy, combination, and agreement between and amongst them as aforesaid, afterwards, to wit, on or about January 13, 1905, did prepare and cause to be prepared in the name of one Martin Boricka, late of No. 294 Wyckoff street, in said borough and county, six (6) certain false and fraudulent bills and claims, the said bills and claims containing false and fraudulent charges, items, and claims against the city of New York for damages fraudulently and falsely alleged by the said William O. Miles, Martin J. McMahon, John B. Scanlon, Frank M. Wandell, Jr., Charles M. Wells, and Daniel Casey in said bills and claims to have been sustained in his chattels and in his real and personal property by the said Martin Boricka, at his said place of residence, on or about the 9th day of October, 1903, the 5th day of July, 1901, the 29th day of June, 1903, the 20th day of August, 1904, the 8th day of August, 1904, and the 14th day of September, 1904, owing to the fact, as it was by the said William O. Miles, Martin J. McMahon, John B. Scanlon, Frank M. Wandell, Jr., Charles M. Wells, and Daniel Casey in said bills and claims fraudulently and falsely represented and alleged, that on the several respective dates aforesaid said Boricka was the owner of the house at No. 294 Wyckoff street aforesaid, and occupied apartments therein, and that the sewer in said street at, near, and in front of said house was, on the various dates aforesaid, inadequate to carry off the water, which fell and accumulated in large quantities on the surface of said street at, near, and in front of said house during rainstorms upon said dates, and that on such dates said sewer because of such inadequacy overflowed and failed to carry off such water, in consequence whereof, as it was further fraudulently and falsely alleged by the said William O. Miles, Martin J. McMahon, John B. Scanlon, Frank M. Wandell, Jr., Charles M. Wells, and Daniel Casey, the apartments of said Martin Boricka in his residence aforesaid were completely submerged with water on each of the dates aforesaid, and the goods, chattels, real and personal

property there belonging to him, the said Martin Boricka, were damaged and destroyed, which property so damaged and destroyed as aforesaid was, as by the said William O. Miles, Martin J. McMahon, John B. Scanlon, Frank W. Wandell, Jr., Charles M. Wells, and Daniel Casey it was fraudulently and falsely represented and alleged, reasonably worth the sum of two thousand one hundred and eighty-seven dollars or thereabouts, whereas, in fact and in truth, said bills and claims were false and fraudulent, in that said apartments of said Martin Boricka were not submerged by water as alleged in such bills and claims on said dates or on any dates whatever, and in that the goods, chattels, real and personal property of said Martin Boricka were not damaged and destroyed thereby, as alleged in such bills and claims, on said dates, or on any other dates, and in that said Martin Boricka did not sustain damage as alleged in such bills and claims in the sum of two thousand one hundred and eighty-seven dollars, or in any other sum, as they the said William O. Miles, Martin J. McMahon, John B. Scanlon, Frank M. Wandell, Jr., Charles M. Wells, and Daniel Casey then and there and at all times well knew, and in that said bills and claims were in all respects false and fraudulent, as they the said William O. Miles, Martin J. McMahon, John B. Scanlon, Frank M. Wandell, Jr., Charles M. Wells, and Daniel Casey then and there and at all times well knew, with intent thereby on the part of them, the said William O. Miles, Martin J. McMahon, John B. Scanlon, Frank M. Wandell, Jr., Charles M. Wells, and Daniel Casey and such other persons, to defraud the city of New York, against the form of the statute in such case made and provided, and against the peace of the people of the state of New York and their dignity."

Argued before JENKS, HOOKER, RICH, MILLER, and GAYNOR, JJ.

Frank Brundage, for appellants.

Robert H. Elder, Asst. Dist. Atty. (John F. Clarke, Dist. Atty., on the brief), for the People.

JENKS, J. This appeal is taken by Miles and Wells from a judgment of the County Court of Kings county convicting them of the crime of conspiracy. Miles and Wells were indicted with McMahon, Scanlon, Wandell, and Casey. McMahon and Scanlon were acquitted. Miles, Wells, and Wandell were convicted. The jury disagreed as to Casey. The trial lasted four weeks. The printed record thereof, which exclusive of many exhibits is 1,126 pages, bristles with motions, objections, and exceptions.

The first question is whether the conspiracy charged was proven; and, if so, the second question is whether Miles and Wells were proven parties to the conspiracy. The alleged false and fraudulent claims were made for damages to real and personal property caused by the overflow of inadequate public sewers into private premises. The liability of the city therefor was adjudged in Seifert v. City of Brooklyn, 101 N. Y. 136, 4 N. E. 321, 54 Am. Rep. 664. In certain quarters of the city at times of excessive rainfalls or of great thaws, such damage has been done to property owners and to tenants. The city and its successor has paid out great sums of money in satisfaction. Claims for such damages are presented to the comptroller of the city, who has set up a bureau to deal with them. The claims, after their filing with the comptroller or his deputy, were sent to the division of law and adjustment in the comptroller's office, whence, after entry therein, they were sent to the said bureau. The head of the bu-

reau assigned each claim to an examiner, who investigated and reported to the head for his approval or disapproval. Frequently upon the basis of such action the claims were adjusted and paid without litigation. In many instances, however, claims have been tried in the courts. Miles is a lawyer. Casey, Wells, and Wandell were engaged about many claims which were presented by Miles as attorney. McMahon was the head of the bureau which I have described, and Scanlon was one of the examiners therein. I may say at the outset that the nature of the claims afforded opportunity for fraud. The claims were of two classes—for damages to realty and for damages to personalty. When the claims were for damages to realty, there was an opportunity for examination of the property, but, when the claims were for damages to goods, articles of furniture, clothing, and the like, then a dishonest claimant ran almost no danger of contradiction, and was checked only by the probabilities in view of his circumstances or of his occupation. Such floods naturally destroyed or rendered worthless the articles, and the owner naturally would not keep even those not wholly destroyed as evidence of his loss. There is a further consideration. Almost all of the claimants examined were of humble circumstances, little versed in the procedure of enforcing their claims. Such persons are the more readily induced by intelligent and cunning persons to sign such papers as are put before them without question or scrutiny in reliance upon those to whom they had committed their claims. This should be borne in mind lest such claimants be put in the category of conspirators, who turned state's evidence on this trial.

I think that the evidence established the conspiracy. Wells and Wandell were shown to visit persons whose premises were situate in districts which had suffered from these overflows, to ascertain that they had suffered some losses thereby, and to solicit their claims for losses against the city. Such persons were persuaded to sign blank forms of claims which would subsequently appear as sworn to before Wells or Wandell, and filled out with the dates of losses and the items and amounts thereof. Bills of particulars were prepared which were given to the claimant, or at least copies thereof, to present to the examiner from the comptroller's office. Claimant after claimant testified that he (or she) never swore to his claim before either Wells or Wandell, that he had never stated the amounts of his loss at all, or that the amounts inserted in the claim signed in blank were never given by him, or that the losses as specified by him orally had been grossly exaggerated, or that items of loss stated had never been given by him and were wholly false. It must be borne in mind that the claim as presented or particularized did not state a gross sum—as e. g., the recovery asked for in a damage suit—but purported to detail the specific items of loss even down to household articles, like clocks, chairs, tables, tools, and the like. The claims were indorsed by Miles as attorney, and the bills of particulars were subscribed by him. He was represented by Wandell and Wells as the attorney who would undertake the claim. The agreement generally of 50 per cent. on the recovery was made with him. He presented the claims, secured the adjustments from the city, tried the claim if it was litigated, collected the settlement or the judgment, and then settled with the claimant. The

contention of the people was that, after Miles had presented a claim, McMahon, as the head of this bureau, so dealt with it as to send it out of his bureau as recommended for settlement or adjustment after examination, well knowing that it was false or fraudulent, or grossly excessive in the amount thereof. A conspiracy may be proved by what is termed "circumstantial evidence," and, indeed, the very nature of the crime often makes it susceptible of none other. Greenleaf on Evidence, § 93 et seq.; Kelley v. People of the State of N. Y., 55 N. Y. 576, 14 Am. Rep. 342; People v. McKane, 143 N. Y. 455, 38 N. E. 950; People v. Peckens, 153 N. Y. 576, 47 N. E. 883. I think, also, that the evidence is conclusive that Wells and Miles, the only parties directly concerned in this appeal, were co-conspirators. It was not necessary to show that Wells or Miles took part in every act, or was actually cognizant of every act which was in furtherance of the conspiracy. Conspiracy implies concert of design, not participation in every detail of execution. Indeed, the fact of conspiracy may exist because one alone could not compass the purpose. Allen, J., in Kelley v. People of the State of N. Y., 55 N. Y. 576, 14 Am. Rep. 342, says for the court:

"A conspiracy may be proved, as other facts are proved, by circumstantial evidence, and parties performing disconnected overt acts, all contributing to the same result and the consummation of the same offence, may, by the circumstances and their general connection or otherwise, be satisfactorily shown to be conspirators and confederates in the commission of the offense. One party may allure the victim into the den, leaving it to others to effect the robbery, and all will be held equally guilty as confederates."

Wells took part in the work of preparing claims, as I have detailed it, which were given to Miles as attorney. Wells had an office either in Miles' office, or at least adjacent to it, and acted in conjunction with Miles. It is testified to repeatedly that his jurats to claims full of fraudulent or excessive items were false, that the claimants had never taken oath to them, and had never authorized him or any one to make them up in the dates, amounts, or items as presented, but on the contrary, had stated losses which were trifling compared to the amounts inserted, and in two or three instances that the claims themselves were entirely false. It is impossible in the compass of this judgment to detail the evidence, but I specify as instances the claims of Monett, Irlanda, Rueger, Dessner, Wasserwash, Bell, Bruno, Berliner, McGauley, and Cora Jones. Miles was the attorney for a multitude of claimants, and among them for the 60 or more called as witnesses in this case. It may be conceded that Miles as an attorney for a claimant could have been imposed upon by a lying claimant or by the artifices of those who interviewed his clients, and reported the claim, and made up the particulars thereof. An innocent attorney may have a false client, a false clerk, a false examiner, and thus have foisted on him a fraud which he may honestly present. I go further to say that an attorney engaged in such a mass of litigation might have been the more readily hoodwinked and deceived in many instances. But the connection of Miles does not depend upon mere inferences alone, but also upon evidence which points unerringly to knowing participation. While the runner's work was not as a rule done by Miles, there are

instances of his personal contact with claimants which are irreconcilable with any conclusion, save that he knew that the claims were false, fraudulent, and padded as presented and as pushed by him. These instances scout the suggestion that he was hoodwinked or deceived by Wells, Wandell, or any other person. I specify his connection with the claimants, Romeo, McGauley, Caveleiro, Rueger, White, Schwartz, Lowenhaupt, Pinto, and Wegner, not to be understood as confining the evidence to these cases.

It is insisted that the indictment was bad in that it charged no crime. The indictment is under section 168 of the Penal Code, and more particularly upon section 4 thereof which provides:

"If two or more persons conspire either * * * (4) to cheat and defraud another out of property, by any means which are in themselves criminal, or which, if executed, would amount to a cheat, or to obtain money or any other property by false pretenses, * * * each of them is guilty of a misdemeanor."

The form of the indictment is in accord with that prescribed by section 276 of the Code of Criminal Procedure, and the terms thereof comply with the requirements of section 275 thereof, in that they show the title of the action, the name of the court, the names of the parties, and a plain and concise statement of the act constituting the crime. If I understand the argument of the learned counsel for the appellant, it rests upon the proposition that the allegation is that defendants conspired to cheat and to defraud the city of New York by procuring certain and divers false and fraudulent claims against said city and bills and claims containing false and fraudulent claims for damages pretended to be sustained. This proposition mistakes the charge. As formulated, it is that the defendants, "devising and intending to cheat and defraud the city of New York out of its money and property," conspired "by procuring certain and divers false and fraudulent bills and claims against said city, and certain and divers bills and claims against said city containing false and fraudulent charges" to be audited, allowed, and paid by the comptroller of the said city, unlawfully to cheat and defraud the city of New York out of its money and property, and to obtain the money and property of the city of New York. A person who knowingly, with intent to defraud, presents, for audit, allowance, or payment, to any officer of any city authorized to audit, allow, or to pay bills, claims, or charges, any fraudulent claim, bill, or account, or containing false or fraudulent charges, items, or claims, is guilty of a felony. Section 672, Pen. Code. The comptroller of the city of New York was such an officer. Greater New York Charter, Laws 1901, p. 50, c. 466, § 149. As the means there alleged were of felonious character, they were criminal within the purview of section 168 of the Penal Code. Moreover, I think that the means as set forth as such "as if executed would amount to a cheat" within the purview of section 168 of the Penal Code. The word "cheat" is thus used in its common-law significance. People v. Olson (Super. Buff.) 15 N. Y. Supp. 778–780. Cheat at common law is such a "fraud as would affect the public; such a deception that common prudence and care were not sufficient to guard against it, as the using of false weights and measures, or false tokens, or where there was

a conspiracy to cheat." People v. Babcock, 7 Johns. 201, 5 Am. Dec. 256. As to the character of the pretense, see People ex rel. v. Oyer and Terminer, 83 N. Y. 449. Conspiracies to cheat a state or county or a city are held indictable as a combination to injure the public. Cyc. "Conspiracy," 633, citing State v. Cardoza, 11 S. C. 195; State v. Young, 37 N. J. Law, 184; McDonald v. People, 126 Ill. 150, 18 N. E. 817, 9 Am. St. Rep. 547. See, too, People v. Olson, 15 N. Y. Supp. 778, and authorities cited. And I think that the means are sufficiently set forth. State v. Young, supra; Madden v. State, 57 N. J. Law, 325, 30 Atl. 541; State v. Cardoza, supra. It was not essential that all of the particular acts and steps in the procurement of the false claims, or in the insertion of false items in claims or towards the procurement of the audit, allowance, and payment thereof by the comptroller, should be spread out in the indictment. As was tersely said by Willard Bartlett, J., in People v. Willis, 34 App. Div. 206, 54 N. Y. Supp. 642:

"In the nature of things, the charge cannot be made any more definite than was the actual agreement of the conspirators. If the conspiracy was indefinite, the pleader cannot be called upon to state a definite conspiracy in order to make the indictment good. Particulars cannot be pleaded which did not enter into the agreement. The real question is whether such agreement, as is stated in the indictment, no matter how indefinite it was, and no matter how general in its terms, constitutes a criminal conspiracy under the statute."

So far as the steps to be taken in the procurement of audit, allowance, and payment are concerned, it was not necessary to state them, as the procedure was "prescribed by the charter of the city, which is a public statute of which the court must take judicial notice," to quote the language of O'Brien, J., writing for the court in People v. Willis, 158 N. Y. 397, 53 N. E. 30. It suffices that "the nature and the purpose of the conspiracy is stated in terms sufficiently clear and specific to enable the defendants to prepare for trial, and the judgment rendered upon it would be a bar to another trial upon the same charge." People v. Willis, supra. In People v. Everest, 51 Hun, 19, 3 N. Y. Supp. 612, Barker, P. J., for the court says:

"As the agreement is the gist of the offense, there cannot be but one trial and conviction where there is but one agreement, although the conspirators may have agreed upon a variety of means by which to accomplish their purpose."

The learned counsel for the appellant insists that the overt act alleged is not sufficient. Referring to the claimant named therein, he asks with reference to his claim: Did he ever see it? Did he ever sign it? Did he ever swear to it? Did he ever know anything about it? Was anything ever done with it? His questions may be answered as he would have them answered without avail to him. Section 171 of the Penal Code provides:

"No agreement except to commit a felony upon the person of another, or to commit arson or burglary, amounts to a conspiracy, unless some act besides such agreement be done to effect the object thereof, by one or more of the parties to such agreement."

It is to be noted that the act to be done is one to effect the object thereof by one or more of the parties. See, too, Wharton on Crim.

Law (5th Ed.) § 1384; 4 Elliott on Evidence, § 2984; Adams v. People, 9 Hun, 89; People v. Chase, 16 Barb. 495. With reference to the overt act alleged, Boricka testified that he never signed his name to the claim; that he never swore to the claim. The jurat was that of Wandell, who has been convicted in this case, and does not appeal. He testifies that he once lost by the floods; that the damage was to carpets and his heater; and he lost some preserves, peaches and pears, all kinds of preserves. The daughter of Boricka testifies that she was presented with certain slips; that she told of some of the losses in the house, to wit, two carpets, a new heater, a back stoop, and some preserves; that she did not tell what the value of the things was; that she signed the name of her father, Martin Boricka; that she asked the examiner to withdraw the case; that she was afterwards scolded by Wandell for withdrawing the case; that she then told Wandell of the damage they had had, some carpets, preserves in the cellar and the heater, and that she thought that was all she told him except about the stoop; that she did not swear to the papers at all; that, as matter of fact, what was lost was two carpets of Brussels and a lot of preserves, and there was damage done to the back stoop where the wood was rotted, about two or three steps; that she did not tell the defendants that she had lost or her father had lost $2,187 in damaged property; that she did not lose any potatoes, nor tea of the value of $20, nor a glass closet worth $35, nor a center table, nor a trunk of clothes worth $100, nor clothing $45, nor that it cost them $20 to pump out the water, nor $60 for the carpets, nor linoleum, 40 yards, nor the two sideboards worth $50, nor a lounge, nor a desk, nor a rug, nor groceries to the amount of $50. The evidence shows that this claim was solicited by Wandell, who annexed a false jurat, that it was fraudulently and outrageously increased by false items, and that it was filed by Miles as attorney. There is not the slightest doubt of Wandell's part in the conspiracy It is established by overwhelming evidence, and he takes no appeal. In State v. Young, supra, the court, per Beasley, C. J., say:

"But this is not an admissible conclusion, for all the pleader is required to do is to set forth 'some act' done to effect the object of the conspiracy. Such overt act may or may not be in itself criminal. The conspiracy is the crime, and the overt act bringing it within the requirements of the statute may be an insignificant affair. A completed crime is shown on the record before us by the averment of a criminal conspiracy and an averment of the doing of anything, no matter what, in furtherance of it. Yielding thereof the premises claimed, the crime in this case is well charged."

The further point is made as to the overt act that, inasmuch as the proof showed that the claimant did sustain material damage by reason of the overflow, therefore the overt act charged in the indictment was not proven as laid. We are cited to People v. King, 19 Misc. Rep. 98, 43 N. Y. Supp. 975, which was cited by this court in Bank of Staten Island v. City of New York, 68 App. Div. 238, 74 N. Y. Supp. 284. That case is not at all in point. It only goes to the extent of holding that a mere excessive charge cannot be the basis of fraud; and, as cited by us, supra, it was simply on the point that mere error of judgment of a board of audit, upon the facts, as to an amount, so long as it keeps within its jurisdiction and acts in good faith, cannot

be the subject of an overhauling. It seems to me absurd to say that, because a part of this claim may have been well founded, therefore no fraud can be alleged, although other parts of it are plainly the result of fraudulent wrongdoing. See People v. Tweed, 5 Hun, 360.

It is contended that the court erred in admitting evidence as to the falsity or fraud of claims of over 60 persons not mentioned in the indictment. It is argued that section 275 of the Code of Criminal Procedure provides that the indictment shall contain a concise and plain statement of the facts or acts constituting the crime, and that, if the indictment does not specify the acts (meaning thereby, I take it, all of the acts to be put in evidence), it becomes a pitfall. The answer to this is that the crime charged is a conspiracy, not the presentation of the false claim of Boricka, that the pleading is not required to state the evidence (People v. Willis, 158 N. Y. 399, 53 N. E. 31), and that the Code of Criminal Procedure expressly provides (section 398):

"Upon a trial for a conspiracy, in a case where an overt act is necessary to constitute the crime, the defendant cannot be convicted, unless one or more overt acts be expressly alleged in the indictment, nor unless one or more of the acts alleged be proved; but any other overt act, not alleged in the indictment, may be given in evidence."

It is insisted that the court erred in receiving the testimony of these claimants, that the defendants Wells, Wandell, and Casey procured them to make the false or fraudulent claims, for the reason that there was no proof of an unlawful combination or conspiracy between Miles, Wells, Wandell, Casey, McMahon, or Scanlon. Russell on Crimes (6th Ed.) 533, says:

"It is a mistake to say that a conspiracy must be proved before the acts of the alleged conspirators can be given in evidence. It is competent to prove isolated acts as steps by which the conspiracy itself may be established."

See, too, 2 Bishop's New Crim. Proc. § 227, subd. 2. Russell, supra, at page 535, lays down the rule that:

"Prosecutor may either prove the conspiracy, which renders the acts of the conspirators admissible in evidence, or he may prove the acts of the different persons, and thus prove the conspiracy."

"The actual fact of conspiring may be inferred, as has been said, from circumstances, and the concurring conduct of the defendants need not be directly proved. Any joint action on a material point, or collocation of independent but co-operative acts, by persons closely associated with each other, is held to be sufficient to enable the jury to infer concurrence of sentiment; and one competent witness will suffice to prove the co-operation of any individual conspirator." Wharton's Crim. Law, 1399.

2 Archbold's Crim. Prac. & Pl. (Waterman's Notes) 1059, *pp. 621, 622, states:

"Wherever the writings or words of any of the parties charged with or implicated in a conspiracy can be considered in the nature of an act done in furtherance of the common design, they are admissible in evidence, not only as against the party himself, but as proof of an act from which inter alia the jury may infer the conspiracy itself. Wherever the writings or words of such a party amount to an admission merely of his own guilt, and cannot be deemed an act done in furtherance of the common design, in that case they can be received in evidence merely as against the party, and not as evidence of the conspiracy, and in strictness ought not to be offered in evidence until after the conspiracy had been proved aliunde."

It cannot be gainsaid that, when the question is whether there was a conspiracy to defraud by presenting a false or fraudulent claim, on proof that some one or more of the defendants procured a claimant to make a false claim, such act is not in furtherance of such conspiracy, and hence of probative force towards the establishment of it.  "If an act or declaration is of such a character as to tend to establish the existence of a conspiracy, then it should not be excluded merely because it is also of such a character as to bind all the conspirators by its consequences in the event of the establishment of the conspiracy."  Farley v. Peebles, 50 Neb. 723, 70 N. W. 231, cited 8 Cyc. 648.  In any event, the order of proof was within the sound discretion of the court, and it is an approved practice that the court may admit the acts or declarations of the alleged conspirators before proof of the conspiracy. Carson's Wright on Criminal Conspiracies and Agreements, citing authorities; Cyc. 682, and authorities cited; Wharton's Criminal Law, 1401, notes; Abbott's Trial Brief, Criminal Cases, p. 318.  The learned trial court was careful to safeguard its rulings with the constant declaration that this evidence and like evidence was relevant upon the conspiracy, provided the conspiracy was established and against those of the defendants who were conspirators.  There is no force in the point that the procurement of a false or fraudulent claim by Wells, Wandell, on Casey was an isolated act.  The question is whether the act was in furtherance of the common combination.  Kelley v. People of the State of N. Y., supra; Commonwealth v. McClean, 2 Pars. Eq. Cas. (Pa.) 368; Wharton's Criminal Law (10th Ed.) 1398. Consequently it was not error to admit the evidence of claimants that they never swore to the claims before Wandell or Wells, whose names nevertheless appeared on jurats affixed to their claims.

Error is assigned in the ruling of the court on page 670, vol. 2, of the "case," in that the court admitted against the appellants certain books and entries.  This was the Black Book.  The book was kept by the defendant McMahon as a history of the sewer claims.  The book was offered in evidence at page 676 at the suggestion and on the consent of McMahon's counsel.  But the counsel for the appellants objected on the ground that there was no foundation laid for it, either under the indictment or in the proof.  The court ruled:

"The book is received in evidence, but only such parts as relate to the matters here in issue or which have been testified to here.  It must not be received as to any time prior to the statute of limitations."

The counsel for McMahon then said:  He would reserve his objection if there was a limit.  "It would be valuable for me to have it in."

"The Court:  When either side objects, I must guard my ruling so as not to make it improper under that objection.  Therefore I take it that the book is in evidence regarding claims simply which have been presented here.  Put it in within the time covered by the indictment.

"The District Attorney:  Then I offer from page 4, beginning April 14, 1904, and all other entries in the book that do not antedate that date.  The indictment was filed February 6, 1906.

"Counsel for the Appellants:  We do not raise any objection on the ground of the statute of limitations.  My position is I simply regard the entries of these people in another office as absolutely incompetent as against my clients.

"The Court: So far as these entries show anything that has been done in the past as relating to a past transaction, it is limited to that, and to that alone, of the person who makes the entry or statement, and so I have ruled regarding the reports. Of course, it may be, if the report is made in the line of duty, the entries made in the line of duty, although it does not contain something, some one has said or done, and it may be a present act or statement which could be admissible as against others conspiring, but to be perfectly safe, as I have before stated, when a report or book contains any statement of a past deed or a past statement or transaction on behalf of any claim, we will take it as against the person making the statement or claim. I have made that statement before; and I want to have it plain."

Turning back to the ruling now objected to, I find that the ruling was made as to an inquiry relative to certain claims presented by the defendant Miles filed in the department. I think that the admission of these entries should be sustained on the authority of Queen v. Blake, 6 Q. B. 126, a leading case cited both in Russell on Crimes, book 2, c. 24, p. 532, and also in 1 Phillips on Evidence (Cowan, Hill, and Edwards' Notes). I find, further, that on page 1070 of volume 2 the learned counsel for these appellants said:

"I want that book all in evidence.

"The District Attorney: It is all in then.

"The Court: Both counsel request that the Black Book go in as from the beginning of these entries.

"The Court: No objection. The book referred to as the Black Book throughout the case is in.

"Counsel for Appellants: I understand the others, these dates begin at a later date."

The point is raised that the learned court erred in admitting the books containing a record of these claims. The purpose of the evidence was stated by the learned district attorney as follows:

"I want to show that there was a policy adopted under McMahon, whereby every other lawyer was not to get the same equal rights, the same equal examination, the same degree of fairness, that Miles was. I want to show that these men were instructed in going out that Towns & McCrossin and other lawyers' cases what they should do with these and what they should do with Miles' cases, and I cannot show that unless I can show what McMahon told these various examiners."

After a long colloquy the court ruled as follows:

"I will allow this simply as against McMahon, not for the purpose of showing that the claims were fraudulent or fake or that Miles' claims were good or fake, but as showing his attitude towards the Miles' claim as compared with others; that is what I will allow it for without indicating in any way that it does show that, but simply upon that proposition and admitted simply against McMahon."

I think that the ruling was right. To sustain this contention of favoritism the prosecution offered evidence that an examiner of a Miles claim who reported against an allowance was directed by McMahon to rewrite his report for an allowance, or, if he reported for some allowance, he was often told to increase the allowance, or that queries of the examiner as to the validity of the claim were suppressed, or, if he reported that the claim was fraudulent, he was still directed to make an allowance, or his report for some allowance was increased; that claims were taken from an examiner who reported adversely,

and given to another examiner; that reports of fraudulent claims with
a withdrawal thereof were destroyed, and another examiner sent out
who reported for an allowance; that McMahon granted subpœnas
for examination in all cases save Miles, which he refused; that in a
given instance of two fraudulent claims one of them (Miles') was allow-
ed, while that of another attorney was marked "Fake"; that McMahon
sent other claims for investigation by the district attorney, and he re-
fused to send Miles', although requested by an examiner; that every
time McMahon received a withdrawal from a claimant represented
by Miles he notified Miles, and that all of this course was pursued
towards Miles alone, and not to other attorneys, and that, on the con-
trary, McMahon reduced their allowances far below the average of
reduction in Miles' cases, or refused them entirely. Many of these
acts, if peculiar to the claimants represented by Miles, naturally tended
to show a studied system of favoritism to Miles on the part of that
official in the comptroller's office whose word went furthest in the
first instance as to the justness of the claim. Of course, it might be
said that the mere proof that a public officer approved or allowed a
claim presented by one attorney and rejected that of another attorney
did not show fraud or even favoritism. I go still further and say
that, even though such two claims arose out of the same casualty,
still the one might be proper and the other wrong, or the official
might honestly mistake, even to the extent of approving the false
claim and disapproving the valid claim. But, where the course, as
in this case, was uniform as to scores and scores of claims represented
by Miles and exclusive of other claims not represented by him arising
from the same casualty, it is almost beyond the limits of credulity
that the official honestly believed that every claim represented by
Miles should receive favorable treatment as against claims for like
casualties from like cause not put into Miles' hands, especially when
the determination of McMahon was almost invariably based upon
examinations by others and their reports, without any personal knowl-
edge whatever on his part. It appeared from analysis of Miles' claims,
compared with those of some other attorneys, that Miles received
nearly 28 per cent. of an allowance, while none of the others received
more than 6 per cent. and several less than 3 per cent. It was not
error in the court to receive the tabulation by an expert of these books.
The learned court said:

"These books 1, 2, and the Black Book have been examined by the jury,
page by page, and time taken in the examination of these books without ob-
jection, page by page and claim by claim, nearly a full day. Now, I can see
no objection to having a statement made as to what the number of these
claims are of the respective lawyers they saw in the book and the various
amounts on the book on their tabulated statement of items, if it be confined
to the books looked at, to be admitted, of course, as against McMahon, on the
request of the district attorney."

The court said again:

"I will instruct the jury, if it ever comes as a question for the jury, that it
is not a question of the number of amounts or number of claims, but it is a
question of their known falsity. That is one of the chief elements in this
case. . If you think this will influence the jury at all, I will state that they

must not consider this as bearing against Miles, but that it is offered as bearing on the attitude of McMahon towards the various claimants. It is a summary of the books which they have examined, and I will allow it for that purpose only, and I will instruct the jury so at this point."

This mere permission of a tabulation is well sanctioned by the practice. Wharton on Criminal Evidence, § 166; 2 Wigmore on Evidence, § 1230; State v. Findley, 101 Mo. 217–223, 14 S. W. 185, and authorities cited; State of Iowa v. Brady, 100 Iowa, 191–196, 69 N. W. 290, 36 L. R. A. 693, 62 Am. St. Rep. 560, and authorities cited. The court did not err in its ruling upon the reports of the examiners, for repeatedly it limited their admission, and finally changed the charge:

"Again, at this point, let me state that certain reports were put in evidence, brought out by one of the attorneys for the defendants, Mr. Stapleton, I think, and these were reports other than those made by Mr. Scanlon, one of the defendants and one of the alleged conspirators. These were reports made on other cases of Mr. Miles, and in them some remarks were made as to the opinion of the examiners; but such evidence could and must not be received by you against Miles and the other three as bearing on the falsity or the known falsity of the Miles claims. It is no evidence against him and his associates. There are some reports of Scanlon's which would be competent evidence to consider, provided you find there was a conspiracy and Scanlon one of the conspirators, and it is proved by other evidence than these reports and the report was made in furtherance of the conspiracy."

And when exception was taken the court further instructed the jury:

"What I mean to charge is if the jury first find from the evidence, excluding such reports, that there was a conspiracy and that Scanlon was one of the conspirators, that in that case so much of his report as is a furtherance of the conspiracy and the purpose of it, and is not a statement of anything said by some one else, or a statement of something done by somebody else, may be received as evidence against all the conspirators. I think that is the law.

"Counsel: Does your honor mean to charge if the report contained statements of what he learned or found out that had occurred prior to that time that that would be any evidence against any of them?"

"The Court: No. That has been my ruling throughout the case. I adhere to the same ruling.

"Counsel: Very well, that is all."

The further point is made that the verdict should not stand, for the reason that some of the conspirators were acquitted. The crime charged is that of a conspiracy or combination; and in such a case if there be two indicted, while one cannot be convicted and the other acquitted, nevertheless the rule is quite clear that it is not essential in a conspiracy that more than two should be convicted; because, as I have said before, a conspiracy is not a case where all must do every act in concert, and therefore the jury may determine that the evidence is sufficient to show some of the alleged conspirators guilty of some acts in furtherance of the criminal combination, and yet insufficient to show others guilty of other acts in furtherance of the combination. Nor is it illogical beyond the mere legal aspect of it. That required the preparation of the claim as part of the audit, allowance, and payment. The jury may have been well convinced that the defendants whom they convicted were guilty of some of the acts in the preparation of the claims, and yet that the individuals whom they acquitted were not shown to be guilty beyond a reasonable doubt

of the acts which they as officials were required to do towards the success of the conspiracy. The guilt of Miles and Wells could be established without the guilt of McMahon and Scanlon. Miles and Wells could have been convicted upon the testimony of witnesses who had never heard of McMahon or Scanlon, or that there were any persons charged with the duties which were cast upon them. Miles and Wells could have been convicted by proof of acts with which McMahon and Scanlon took no part, for their action began after the presentation of these claims to the comptroller.

The other exceptions have been considered, although only the main ones have been discussed. It is unprofitable, if not impossible, to review every exception to rulings upon evidence in these 1,200 pages, which represent a legal battle hotly contested at every point. Suffice it to say that we cannot see that the defendants have been prejudiced. It appears to me that the court held the balance true, and presided with marked fairness and ability.

The judgment and order must be affirmed. All concur, except RICH, J., who dissents in part.

RICH, J. (dissenting). I dissent upon the ground that the books from the comptroller's office, admitted for the purpose of making a comparison between the sums allowed upon claims presented by Miles with those presented by other lawyers, were improperly received, and that it was error to admit the evidence of the expert upon this subject. It cannot be said that the jury was not prejudiced by this evidence, and I must vote for a reversal of the judgment upon these grounds.