[Crim. No. 649.   Third Appellate District.—January 11, 1923.]

THE PEOPLE, Respondent, v. WALTER E. BECK et al., Appellants.

[1] CRIMINAL LAW—CONSPIRACY TO BRIBE SUPERVISOR—OVERT ACTS—EVIDENCE.—In a prosecution under an indictment charging that the defendants conspired to bribe a supervisor to influence his vote upon the question of adopting a prohibition ordinance, the payment of money by each of the defendants, the solicitation of money by them, and the receipt of money from a third person, are sufficient overt acts to make the alleged crime of conspiracy complete.

[2] ID.—ORDER OF PROOF—DISCRETION.—In this prosecution for conspiracy, the trial court did not abuse its discretion in permitting proof of declarations by the defendants without first having required independent evidence of the alleged conspiracy.

[3] ID.—SOLICITATION OF CONTRIBUTION—DENIAL OF MOTION TO STRIKE OUT ANSWER—LACK OF PREJUDICE.—A witness for the prosecution, in response to a question whether one of the defendants had asked him to contribute money, having replied: "He told me it would take twenty dollars apiece and I took it for granted he was asking me for that amount, but the exact words he used, I can't relate," but defendants' motion to strike out such answer having been directed to the answer in its entirety, and not merely to the objectionable part thereof that "I took it for granted he was asking me for that amount," the denial of such motion did not result in a miscarriage of justice, particularly where other evidence in the case showed that said defendant was in fact seeking a contribution from the witness.

APPEAL from a judgment of the Superior Court of El Dorado County. George H. Thompson, Judge. Affirmed.

---

1.   Bribery and solicitation of bribes, note, 116 **Am. St. Rep.** 38.
     60 Cal. App.—27

The facts are stated in the opinion of the court.

E. Fitzgerald, Eugene S. Wachhorst, Donald E. Wachhorst, T. A. Farrell and George A. Work for Appellants.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

FINCH, P. J.—The defendants were convicted of conspiracy and prosecute this appeal from the judgment of conviction and the order denying their motion for a new trial. The indictment charges that the defendants conspired to bribe one of the supervisors of El Dorado County to influence his vote upon the question of adopting a prohibition ordinance, and that they, "in pursuance of said conspiracy and to effect the object thereof, did each contribute . . . the sum of twenty dollars . . . and did solicit money from one E. J. Barrett and from other persons to the grand jury unknown; and . . . did collect and receive . . . the sum of twenty dollars . . . from one John Zugnoni."

The defendant Beck was the proprietor of a hotel and the defendant Calvert of the Klub Cafe in Placerville. Barrett and Zugnoni were in business in Camino, a few miles above Placerville, and Seymour Hill, a witness at the trial, conducted a business at El Dorado, a few miles below. It is to be inferred from the evidence that these five persons sold soft drinks at their respective places of business. In November, 1921, the board of supervisors had under consideration the adoption of an ordinance prohibiting the unlawful manufacture, possession, transportation, and sale of intoxicating liquors. The proposed ordinance was defeated by a majority vote of the supervisors on the 8th of November. Appellants' main contention is that the evidence is insufficient to prove such conspiracy. Some of the evidence was admitted generally as bearing upon the charge against both defendants, some parts thereof were expressly limited by the prosecuting attorney and the court to the charge against Beck and other parts to that against Calvert. The testimony will be stated accordingly under three heads.

*Evidence not Limited.*

The defendant Calvert testified that in a conversation between himself and Beck on the 5th of November the latter

"spoke of the Little Volstead Act which was coming up for a vote before the board of supervisors the following week. He told me he had been led to believe it might pass and if it did, he suggested we get busy and start a referendum to put it to a vote of the people, which had been done the spring previous when he and Mr. Bert Simmons, who was then the proprietor of the Klub Cafe, and stood the cost, or most of the cost of the referendum"; that on the 7th of November he took Mrs. Calvert, at her request, down to El Dorado to meet the Seymour Hill family, arriving there about 9:30 in the forenoon; that in a conversation there with Hill "I mentioned the fact about this Little Volstead Act coming up. . . . I told him what Mr. Beck had led me to believe that they might pass it and that it would be a good thing to get busy and take up a little money to start a referendum. . . . Mr. Hill . . . said he wished to Christ they would pass the Little Volstead Act"; that he and his wife returned to Placerville and that the latter then suggested that they drive up to Camino "and perhaps have an Italian dinner"; that they proceeded to Camino and arrived at Zugnoni's place about noon, where they had lunch; that after lunch his wife requested him to take her up to see a dance-hall which he had told her about and that they drove up to a point near Barrett's place where the witness left his wife in the machine and proceeded on foot to Barrett's place of business; that "I passed the time of day with Mr. Barrett, I said to him . . . 'I met our friend Beck as I was coming up to Camino' which I had met Mr. Beck a couple of miles down from Camino. Mr. Barrett said: 'Yes, what the hell do you think he was up here doing?' I said: 'I don't know.' He says: . . . 'He has been up here trying to gather up some money to start a referendum, he says they are going to pass the Little Volstead Act over you fellows down there.' . . . I said: 'I believe myself they are.' . . . Barrett says: 'I wish to Christ they would'; that he did not 'have a chance' to ask Barrett for money for the referendum, that 'Mr. Barrett was in favor that they pass the Volstead Act.'"

Zugnoni testified that some time prior to November 11th Beck called at his place of business and asked for money; that he did not remember for what purpose Beck desired the money, but thought it was for a bill which Mrs. Zugnoni

owed; that Beck did not state the amount he desired; that he, Zugnoni, did not have the money at the time but paid Beck twenty dollars November 11th. Zugnoni was apparently an unwilling witness for the prosecution. He testified that his memory was very poor and most of his answers were: "I don't remember." It was for the jury to determine whether the witness was deficient in memory or willfully evasive.

*Evidence Limited to Charge Against Beck.*

Barrett testified that Beck met him at Camino on the 7th of November and "told me that the supervisors were about to meet and that the Little Volstead Act was coming up to be voted on. He said that the vote could be turned but it would take a little change. He said there were two wet and two dry; that is about all"; that Beck said the fifth supervisor "was on the fence." The witness then answered questions as follows: "Q. Did or did not in that conversation Mr. Beck say to you anything about money or the amount of money which it would take to influence this vote? A. He did. Q. What amount, if any, did he state? A. Twenty dollars. . . . I contended it was too cheap to have anything to do with. Q. During that conversation whose name, if any, was mentioned in connection with this matter—what other name, if any? . . . The name of anybody else who would be likely to contribute, or who would be asked to contribute money? . . . A. He mentioned John Zugnoni of Camino and John George, the Ivy House, Pacifico's and Seymour Hill. . . . Himself and Calvert. Q. Did or did not you in response to that request or that suggestion give Mr. Beck any money? A. I did not. . . . He told me it would take twenty dollars apiece and I took it for granted he was asking me for that amount, but the exact words he used I can't relate. . . . He told me it might take more later on."

*Evidence Limited to Charge Against Calvert.*

Barrett testified that on the 7th of November, after Beck had left, Calvert called at the witness' place of business; that "when he first came in he said: 'I met Beck going down the road' and he wanted to know if he didn't see me; . . . I said yes and I went on to explain to him what he was there for. . . . I gave him my version of it. . . . He told me that Seymour Hill was of the same opinion that I was"; that no reference was made to a referendum while

Calvert was there. Hill testified that Calvert called on him at El Dorado on the 7th of November and "spoke something about raising a little fund of money for something and he wanted to know what I thought about it, in fact he never talked very much to me about it"; that he mentioned the name of one of the supervisors and "I told him I didn't want anything more to do with it. . . . He says: 'I don't think much about it myself.' . . . He mentioned" the name of a supervisor "and I said: 'I don't know anything about what you intend to do, but in my opinion it would not get any further than his pocket anyhow.'" Charles Hand, sheriff of the county, testified that on the 13th of December he called Calvert to the sheriff's office and "I informed Mr. Calvert of the facts in the case as I understood them, and Mr. Calvert told me that Mr. Zugnoni had contributed twenty dollars and that Mr. Beck had contributed twenty dollars and that he had contributed twenty dollars; that there was sixty dollars raised. . . . He said it was for the purpose of influencing the board of supervisors on the vote that was to be taken on the Little Volstead Act. He said, furthermore, . . . that he did not think very much of the proposition but he did not want to appear cheap and be a piker so he said: 'I just threw them twenty dollars.'" Other witnesses testified to admissions made by Calvert but their testimony is only cumulative and need not be stated.

If it be conceded that the statements of Beck and Calvert, as related by Barrett and Hill, were admissible as evidence against both defendants, on the theory that they were statements made in furtherance of the alleged conspiracy, such evidence can be considered only with relation to the charge against the defendant to whose case it was expressly limited, because the other defendant might possibly have been able to disprove such testimony if it had been admitted as evidence against him. Keeping in mind such limitation, it is fairly to be inferred from the evidence of Calvert, which was not limited, that on the 5th of November the defendants agreed to raise money for the defeat of the proposed ordinance, either by influencing the supervisors to vote against its adoption or by bringing about a referendum in case of its passage. On the 7th of November they both went out to raise the necessary funds. The fact that they solicited money prior to the time at which the supervisors were to

vote upon the ordinance, at a time when they did not know whether a referendum would be necessary, is a circumstance to be considered in determining what use they intended to make of the money. Zugnoni's testimony, which was not limited, shows that Beck solicited and was paid twenty dollars for some purpose and, still keeping in mind the limitations upon the testimony, the jury was warranted in believing from the evidence admitted against either defendant that this money was solicited and received for the purpose of carrying out the agreement of November 5th. In view of the manner of his testifying and the character of his testimony, the jury may well have believed Zugnoni's statements as to the solicitation and payment of the money and refused to accept his statement that he thought the money was given in payment of a bill which his wife owed to Beck. Then particularly as to the charge against Beck, the testimony of Barrett is sufficient to show that Beck was endeavoring to raise money to bribe one of the supervisors. Calvert's interview with Hill and Barrett and his admissions to the sheriff are amply sufficient to show that he was endeavoring to accomplish the same purpose. It is true that Calvert denied the incriminating statements attributed to him, but this court has to do only with the sufficiency of the evidence, not its weight. The criminal purpose of the defendants was not proved by direct evidence, but may be inferred from their acts and declarations. In cases such as this the prosecution is usually under the necessity of relying on the testimony of unwilling witnesses for a conviction. As said in *Jenkins* v. *Commonwealth*, 167 Ky. 544 [3 A. L. R. 1522, 1532, 180 S. W. 961], "from the nature of the crime itself it is difficult to prove a criminal conspiracy by direct evidence, and such conspiracies are most always proved by circumstantial and 'piecemeal' evidence."

[1] Section 184 of the Penal Code provides: "No agreement amounts to a conspiracy, unless some act, besides such agreement, be done within this state to effect the object thereof, by one or more of the parties to such agreement." The overt acts here charged are: (1) The payment of twenty dollars by each defendant; (2) The solicitation of money; (3) The receipt of twenty dollars from Zugnoni. The evidence is sufficient to establish all of these alleged

overt acts as against Calvert but only the second and third as against Beck. It seems clear that these acts are sufficient to make the alleged crime of conspiracy complete. The first step necessary to effect the object of the conspiracy was to solicit and collect the money to be given as a bribe and these acts were certainly done in pursuance of the conspiracy. "A mere conspiracy, without overt act done in pursuance of it, is not punishable criminally, yet the overt act need not be, in and of itself, a criminal act; still less need it constitute the very crime that is the object of the conspiracy." (*Pierce* v. *United States,* 252 U. S. 239 [64 L. Ed. 542, 546, 40 Sup. Ct. Rep. 205] ; *United States* v. *Rabinowich,* 238 U. S. 78 [59 L. Ed. 1211, 35 Sup. Ct. Rep. 682, see, also, Rose's U. S. Notes].) In *Donaldson* v. *United States,* 208 Fed. 4 [125 C. C. A. 316], plaintiff in error was convicted of conspiracy to receive, conceal, and facilitate the transportation of opium unlawfully imported into the United States. The court said: "The plaintiff in error performed the overt act of requesting Powers to aid in unloading certain specified opium then in the harbor on the steamship 'Siberia,' and he took him to the steamer and introduced him to the Chinaman who had the opium in charge. Thereafter Gallagher (a co-conspirator) went with Powers from San Francisco to Oakland. to accomplish the object of the conspiracy. These were acts which tend to effect the object of the conspiracy, and it was enough if one of the acts charged was proven to have been done." The following have been held sufficient overt acts under charges of conspiracy: Provisioning and sailing of a vessel in a conspiracy to smuggle Chinese into the United States. (*Daly* v. *United States,* 170 Fed. 321 [95 C. C. A. 107].) Telegraphic orders by one conspirator to another to make shipments of intoxicating liquors in a conspiracy to unlawfully ship such liquors. (*Witte* v. *Shelton,* 240 Fed. 265 [153 C. C. A. 191].) Cutting telegraph wires and going to or near the place at which the offense was to be committed in a conspiracy to rob the United States mail. (*Collier* v. *United States,* 255 Fed. 328 [166 C. C. A. 498].) Calling upon a co-conspirator in pursuance of and to effect the object of the conspiracy. (*Gruher* v. *United States,* 255 Fed. 474 [166 C. C. A. 550].) Registration of an illegal

voter in a conspiracy to procure such person to vote. (*State* v. *Nugent*, 77 N. J. L. 84 [71 Atl. 485].)

[2] Appellant contends that the court abused its discretion in permitting proof of declarations by defendants without first requiring independent evidence of the alleged conspiracy. "Generally conspiracies cannot be proved as an independent fact, such as the execution of a promissory note, but are shown from circumstances, some testified to by one witness and others by other witnesses. It is largely in the discretion of the court as to how much evidence of the existence of the conspiracy shall be required before receiving evidence of the acts and declarations of one of the alleged conspirators in the absence of the other." (*People* v. *Daniels,* 105 Cal. 262, 265 [38 Pac. 720].) It does not appear that the court abused its discretion as to the order in which the evidence was produced or that the defendants suffered any possible prejudice on account of such order of proof.

[3] In answer to a question whether Beck had asked him to contribute money, the witness Barrett replied: "He told me it would take twenty dollars apiece and I took it for granted he was asking me for that amount, but the exact words he used, I can't relate." Counsel for defendants moved the court to strike out the answer. The motion was denied. The motion was directed to the answer in its entirety. The only objectionable part of the answer at most is the statement, "I took it for granted he was asking me for that amount." The motion to strike out should have been directed specifically to the objectionable part since the other parts were entitled to stand. (*People* v. *Ho Kim You,* 24 Cal. App. 451, 459 [141 Pac. 950].) In any event, it is to be inferred from Beck's statements, as testified to by Barrett, that he was in fact seeking a contribution from the witness, and it does not appear that the denial of the motion resulted in a miscarriage of justice. The controverted issues were resolved against the appellants by the jury and, since there was sufficient evidence to support the conclusion of guilt, this court cannot interfere with the verdict.

The judgment and order are affirmed.

Burnett, J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 12, 1923.

All the Justices concurred.