[Crim. No. 1194. Second Appellate District, Division Two.— September 29, 1925.]

## THE PEOPLE, Respondent, v. W. N. GEORGE, Appellant.

[1] CRIMINAL LAW—CONSPIRACY—NECESSITY FOR OVERT ACT.—Under the English law, the crime of conspiracy lay in the combination— in the mere meeting of the minds of the conspirators in an intent to embark upon an illicit enterprise; and the requirement that an overt act must be committed in furtherance of a conspiracy before criminality will attach is an American innovation of the law of criminal conspiracy.

[2] ID. — OVERT ACT — ATTEMPT TO COMMIT CRIME — PLEADING.—In pleading an overt act under the law of conspiracy, an information or indictment need not aver an attempt to commit the crime which is the object of the conspiracy.

1. See 5 Cal. Jur. 498; 5 R. C. L. 1066.

[3] ID.—SUFFICIENCY OF OVERT ACT—CONSTRUCTION OF SECTION 184, PENAL CODE.—The provision of section 184 of the Penal Code that no agreement "amounts to a conspiracy, unless some act, besides such agreement" be done to effect the object of the agreement, does not require that there be an attempt to commit the offense contemplated by the conspirators, but only that there be some overt act tending in some degree to effectuate the object of the illicit enterprise contemplated by the conspirators.

[4] ID.—GIST OF OFFENSE — COMBINATION.—Under the terms of section 184 of the Penal Code the agreement or combination, and not the attempt to put into effect the illicit enterprise, is the gist of a criminal conspiracy.

[5] ID.—ACTS COMMITTED — SUFFICIENCY OF INDICTMENT. — In this prosecution under an indictment charging the crime of conspiracy to obtain money by false pretenses, the acts charged, following the allegation that they were done after the illicit combination "and in the course of said conspiracy and in furtherance thereof," were sufficient, taken together, to meet the requirement of section 184 of the Penal Code that no agreement "amounts to a conspiracy, unless some act, besides such agreement" be done to effect the object of the agreement; and defendant's demurrer to the indictment was properly overruled.

[6] ID.—CODE SECTION VIOLATED—PLEADING.—In this prosecution on a charge of criminal conspiracy, taking the indictment as a whole, it plainly, singly and with certainty, charged a conspiracy to violate the terms of section 532 of the Penal Code, and there was nothing in it that could have misled defendant to the view that the charge was based upon section 549 of said code.

[7] ID.—CONSPIRACY—EVIDENCE—VERDICT.—In this prosecution on a charge of criminal conspiracy to defraud a life insurance company, the evidence of the conspiracy was unusually full and complete, and there was ample evidence from which the jury was justified in finding a verdict of guilty of the crime charged in the indictment.

[8] ID.—EVIDENCE—OVERT ACTS—INSTRUCTIONS.—In such prosecution, the trial court did not commit reversible error in giving an instruction to the effect that the defendants were to be found guilty if the jury was justified beyond a reasonable doubt that the illicit combination was formed, without informing the jury in that particular instruction as to the necessity of proof of an overt act, where other instructions which were given fully covered

3.  See 5 Cal. Jur. 499.

4.  See 5 Cal. Jur. 497.

5.  See 5 Cal. Jur. 510; 5 R. C. L. 1066.

the law as to overt acts, and the uncontradicted evidence was so complete upon the subject of overt acts that the jury could not have found that no overt act was committed.

(1) 12 C. J., p. 549, n. 61, p. 550, n. 63, p. 551, n. 67, p. 552, n. 79, p. 624, n. 37; 16 C. J., p. 112, n. 3, p. 113, n. 14, 16, 17, p. 114, n. 21.   (2) 12 C. J., p. 625, n. 48 New.   (3) 12 C. J., p. 551, n. 68 New.   (4) 12 C. J., p. 551, n. 65.   (5) 12 C. J., p. 624, n. 37. (6) 12 C. J., p. 614, n. 68.   (7) 12 C. J., p. 638, n. 80.   (8) 16 C. J., p. 1049, n. 82, p. 1050, n. 84; 17 C. J., p. 344, n. 35, 36.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Carlos S. Hardy, Judge. Affirmed.

The facts are stated in the opinion of the court.

W. H. Wadsworth, Herman Mohr, Bordwell, Mathews & Wadsworth for Appellant.

U. S. Webb, Attorney-General, and Erwin W. Widney, Deputy Attorney-General, for Respondent.

WORKS, J.—Defendant W. N. George and others were charged by indictment with the crime of conspiring to obtain money by false pretenses. All of the defendants except Hughes were convicted. Defendant George appeals from the judgment of conviction.

The indictment, shortened by the omission of formal matters and of allegations which are not material to the inquiry upon which we now embark, was in the following language:

"The said defendants John Dexter Wiley, Belle Wiley, W. N. George, and H. J. Hughes are accused . . . of the crime of conspiracy to obtain money and property by false pretenses, a felony committed . . . as follows, to-wit: That . . . said defendants . . . did . . . conspire, . . . by divers unlawful, false and fraudulent representations and pretenses to obtain the sum of ten thousand dollars . . . from the Great Republic Life Insurance Company, a corporation, . . . upon the false and fraudulent representation and pretense to be made by the said defendants Belle Wiley and W. N. George to the said . . . company that the said John Dexter Wiley had been drowned and lost his life . . . by

falling overboard from a boat into the waters of the Pacific
Ocean, . . . and that the said Belle Wiley was entitled to
receive said sum . . . from the said . . . company under a
policy of insurance covering the life of the said John Dexter
Wiley, . . . the said Belle Wiley being then and there the
beneficiary named in the said policy of insurance; . . .
That thereafter and in the course of the said conspiracy and
in furtherance thereof, . . . the company through the said
defendant W. N. George, as soliciting agent of said company
for a policy of insurance upon his, the said John Dexter
Wiley's life, in the sum of ten thousand dollars, and that
thereafter . . . the said John Dexter Wiley received from
the said . . . company and the said defendant W. N. George
the said policy of insurance upon his, the said John Dexter
Wiley's life, . . . with the said Belle Wiley named therein
as beneficiary in the event of the death of the said insured,
John Dexter Wiley; that thereafter and in the course of
said conspiracy and in furtherance thereof . . . the said
defendants John Dexter Wiley and W. N. George caused
and induced one Joseph McAfee to agree to permit the . . .
defendants . . . to allow them . . . to use . . . the said
Joseph McAfee's boat known as the "Catalina Flyer" for
the purpose of making a false, fraudulent and fictitious
showing and representation to said . . . company that the
said John Dexter Wiley had lost his life by falling overboard
from said boat while said boat was cruising in the waters
of the Pacific Ocean; . . . that thereafter and in the course
of said conspiracy and in furtherance thereof . . . the . . .
defendants . . . procured for the said John Dexter Wiley
a hat and a pair of colored spectacles for the use and pur-
pose of fraudulently disguising and changing the appearance
of the said John Dexter Wiley to assist the said John Dexter
Wiley in getting away undetected from the scene of said
false and fraudulent representation of drowning by the said
John Dexter Wiley; that thereafter and in the course of
the said conspiracy . . . the said defendants secured certain
other clothing and wearing apparel of [for(?)] the said
John Dexter Wiley and caused . . . the said defendants
H. J. Hughes and W. N. George to wait at the harbor of
San Pedro . . . with the said clothing and an automobile
for the purpose of carrying and conveying the said John
Dexter Wiley out of the . . . State of California for the

purpose of hiding the identity of the said John Dexter Wiley
and for the purpose of assisting the said John Dexter Wiley,
Belle Wiley, W. N. George, and H. J. Hughes in effectuat-
ing and making the said false and fraudulent claim to the
said . . . company that the said John Dexter Wiley had
met his death as aforesaid; that thereafter and in the course
of the said conspiracy . . . the said defendants John Dexter
Wiley and Belle Wiley went upon the said boat of the said
Joseph McAfee . . . and that . . . said boat under the com-
mand of said Joseph McAfee shipped away ostensibly for
the purpose of making a cruise around . . . [the] Island of
Catalina; that thereafter and in the course of the said con-
spiracy, . . . while the said boat was on its said cruise, and
at a point adjacent to the shore of said Island of Catalina,
. . . the said Belle Wiley did then and there falsely and
fraudulently represent and pretend to the said Joseph Mc-
Afee and to the passengers on said boat that the said John .
Dexter Wiley had fallen overboard from said boat; and the
said John Dexter Wiley did then and there falsely and
fraudulently represent and pretend to the said Joseph Mc-
Afee and to the passengers on said boat that he had fallen
overboard from said boat; that in truth and in fact the
said John Dexter Wiley had not fallen overboard from said
boat but in truth and in fact did then and there falsely
and fraudulently make the representation that he had fallen
overboard from said boat and had immediately thereafter
gone through a hatch in the said boat and to a lower deck
and portion thereof and there disguised his appearance and
hid himself; that thereafter and in the course of the said
conspiracy . . . the said defendants John Dexter Wiley,
Belle Wiley and W. N. George caused and procured the said
Joseph McAfee and the engineer of said boat to proceed to
the city of Avalon, at said island of Catalina, . . . and there
put ashore the said John Dexter Wiley from the said boat
while the same was anchored in the harbor of said Avalon
and while the said John Dexter Wiley was then and there
disguised as aforesaid; that thereafter and in the course of
said conspiracy . . . the said defendants H. J. Hughes and
W. N. George procured the clothes and wearing apparel of
the said John Dexter Wiley and procured an automobile and
thereafter . . . proceeded to the harbor of San Pedro . . .
aforesaid, and there awaited the arrival of the said John

Dexter Wiley to take him out of the . . . state of California for the purpose hereinabove stated. . . . ''

This pleading was demurred to and the demurrer was overruled. It is now contended that it should have been sustained.

Section 182 of the Penal Code provides, in part: ''If two or more persons conspire: . . . To cheat and defraud any person of any property, by any means which are in themselves criminal, or to obtain money or property by false pretenses or by false promises with fraudulent intent not to perform such promises; . . . '' they shall be punished in a certain manner. Section 184 of the same enactment reads: ''No agreement amounts to a conspiracy, unless some act, beside such agreement, be done within this state to effect the object itself, by one or more of the parties to such agreement and the trial of cases of conspiracy may be had in any county in which any such act be done.'' These are the provisions which determine the question whether the indictment states a public offense. The specific question presented for our consideration is this: Does the pleading allege the commission of the overt act contemplated by the language of section 184?

It is insisted that in determining this question we may resort with profit to adjudications passing upon the sufficiency of indictments or informations which charge attempts to commit various crimes. It is said that the strength and stature of the present indictment may be measured accurately by the standards furnished by such adjudications, and as introductory to an examination of them appellant quotes the following from a noted text-writer: ''Two elements—each distinct from the other, and not commonly operating together, but each in its own separate class of cases, dominate the law of conspiracy. The one is *combination*, the other *attempt*. Thus— . . . In many circumstances, if two or more combine to do a wrong—whether as the means to something else or as the contemplated end— such mere combining more endangers or disturbs the community than would the executed wrong accomplished by the single will. This is the central idea in the law of conspiracy. . . . In other circumstances, there is no special evil in the combination, and its indictable quality does not consist in this linking of wills for wrong. Then the thing contem-

plated must be such as would be indictable if performed by one, and the conspiracy is punishable simply because it is an attempt. . . . We have already seen, in a general way, that to a certain extent conspiracy is a species of attempt. And— . . . The act of conspiring, and the specific intent to accomplish what constitutes a substantive crime, are in combination a criminal attempt, and it is the professional usage to term it a conspiracy. It follows the same rules, and is subject to the same limitations, as other attempts. . . . In attempt conspiracies—wherein the mischief does not lie specially in the combining, the wrong intended must be such as would be indictable if actually done by a single individual; and when it is such, the conspiracy is generally punishable'' (Bishop, New Crim. Law, 8th ed., secs. 173, 191, 195). ''A conspiracy being an attempt to do something not yet accomplished, in reason the rule in other attempts applies to it . . . '' (2 Bishop's New Criminal Procedure, sec. 207).

Respondent vigorously assails these views of Mr. Bishop, and we are thus brought to a consideration of some of the basic principles of the law of conspiracy, for if the celebrated author correctly states the law the indictment under which appellant was convicted falls far short of sufficiency. Granting that the quoted text is not obnoxious to the vigorous protest registered by respondent, it is evident that under the law of this state such conspiracies as that with which we have now to deal must fall within the class designated as attempts in the early part of the excerpts which we have culled from the book. If we take the portion of section 182 of the Penal Code which is set forth above, and add to it the terms of section 184, it is obvious, if also we concede that Mr. Bishop is right, that in this jurisdiction there is no ''special evil''—no criminalty—''in the combination.'' If he is right, the test is here met that ''the thing contemplated must be such as would be indictable if performed by one.'' Also, then, ''the conspiracy is punishable simply because it is an attempt,'' and the indictment must be viewed in the light of the law touching attempts. The eighth edition of Bishop's New Criminal Law, from which the greater part of the above quotations is made, was published in 1893. The ninth edition of the same work appeared in 1923—thirty years later—and the text of the eighth is repeated *verbatim* in it.

We have made no attempt to ascertain the state of the author's text upon the same subject in editions earlier than the eighth. Without that, the time is more than ripe for a condemnation of Mr. Bishop's language, if he is wrong. In order to ascertain whether he is wrong we must determine whether, under statutory enactments similar to section 184 of our Penal Code, it was the legislative intent merely to fasten criminality upon several for the performance of acts which would be criminal as "attempts" if performed by one, or whether it was intended to make the test of criminality the performance of acts, as distinguished from the mere meeting of minds in the formation of a conspiracy, even if such acts, when measured by the law concerning attempts, were but acts of preparation and therefore not punishable.

[1] It may be premised without the citation of authority that under the English law, from which, of course, our law of conspiracy is descended, the crime mentioned lay in the combination—in the mere meeting of the minds of the conspirators in an intent to embark upon an illicit enterprise. The requirement that an overt act must be committed in furtherance of a conspiracy before criminality will attach is an American innovation in the law of criminal conspiracy. Statutes inaugurating the innovation have been enacted by Congress and by the legislatures of several of the states, including our own. We are therefore to inquire what was the basic object of the departure from the principles of the English law upon the subject, and of the law of the several states in which those principles still obtain.

In order to lay a further foundation for the ascertainment of this basic object, and, further, in order to elucidate more fully certain general observations which we have made above, it is necessary to examine a little more closely into some features of the law of attempts as it exists in the jurisprudence of this state. This purpose will be sufficiently accomplished by the making of quotations from several cases. "Between preparation for the attempt [to commit a crime] and the attempt itself, there is a wide difference. The preparation consists in devising or arranging the means or measures necessary for the commission of the offense; the attempt is the direct movement toward the commission after the preparations are made. To illustrate: A party may pur-

chase and load a gun, with the declared intention to shoot
his neighbor; but until some movement is made to use the
weapon upon the person of his intended victim, there is
only preparation, and not an attempt. For the preparation,
he may be held to keep the peace; but he is not chargeable
with any attempt to kill. . . . The attempt contemplated
by the statute must be manifest by acts which would end
in the consummation of the particular offense, but for the
intervention of circumstances independent of the will of
the party" (*People* v. *Murray*, 14 Cal. 159). "Mere inten-
tion to commit a specific crime does not itself amount to an
'attempt' as that word is employed in the criminal law.
There must, in addition to the wicked intent—the *mens rea*—
be some act done toward the ultimate accomplishment of
the proposed crime. But even such acts do not always of
themselves amount to an 'attempt,' or to an offense of which
human laws will take cognizance, for if they be but acts
of preparation, however elaborate, our municipal law . . .
would not assume to deal with them. For instance, the
construction of the dynamite bomb by the prisoner at his
home . . . with the deliberate intention on his part to
employ it the next morning in destroying the lives and
property of others, atrocious as it was, and indefensible *in
foro conscientiae*, was but an act of preparation, and when
perfected did not render him amenable to the municipal law,
. . . or punishable by its rules" (*People* v. *Stites*,·75 Cal. 570
[17 Pac. 693]). "[I]f one deliver to his agent a false in-
strument with the design that the agent shall utter or pass
it, the crime of uttering or attempting to pass is not com-
plete until after some overt act done by the agent to this
end, for, until this shall come to pass, in contemplation of
law the paper is still within the control of the principal,
and all the steps are but steps of preparation" (*People* v.
*Compton*, 123 Cal. 403 [56 Pac. 44]). "An attempt to com-
mit a crime is an endeavor carried beyond mere preparation
but falling short of execution of the ultimate design. It is
an act immediately and directly tending to the execution of
the principal crime, and committed by the prisoner under
such circumstances that he had the power of carrying his
intention into execution, and would have done so but for
some intervening cause. The law recognizes a distinction
between an intention to commit a crime and an attempt to

commit such crime. An intention followed by no overt act cannot be punished'' (*Ex parte Floyd*, 7 Cal. App. 588 [95 Pac. 175]). ''Generally speaking, the attempt as distinguished from mere preparation, consists of some direct movement toward the consummation of the intended crime after the preparations have been made. . . . The difficulty generally is in determining the proximity of the overt act or acts to the complete accomplishment of the substantive crime. The acts proximately leading up to the consummation of the intended crime need not include the last proximate act for its completion. It is sufficient if the overt acts reach far enough toward the accomplishment of the intended offense to amount to the commencement of its consummation. That is to say, if the actual transaction has commenced which would have ended in the crime if not interrupted, there is an attempt to commit the crime'' (*People* v. *Lanzit*, 70 Cal. App. 498 [233 Pac. 816]). These authorities, it will be noted, establish a clear line of distinction between mere acts of preparation, on the one hand, and those acts, on the other, which are more than merely preparatory and which rise to the dignity of actual attempts to commit crime. In ingrafting their innovation upon the principles of criminal conspiracy at common law, did American legislative bodies, in requiring the commisson of overt acts before criminality attaches, contemplate the performance of acts which under the law of attempts would be merely preparatory, and therefore innocuous under that law, or did they intend that such overt acts should amount to criminal attempts? Did they, in other words, intend no more than that the law of conspiracy should be so altered that under it the law of attempts should be applied to conspiracies, that by means of the illicit concord of minds all the conspirators should be punished when the attempt was committed by all of them, or by any number less than all, and that short of actual ''attempts'' by some or one of them, none should be punished? Did they intend so to reframe the law that, again to quote from Bishop, ''the conspiracy is punishable simply because it is an attempt''? It will be observed that an affirmative answer to the last two of these questions is to be based only upon the view that, in those jurisdictions in which an overt act is required before criminality appears, a drastic and

revolutionary change has been effected in the law of conspiracy.

There are a few decided cases in which the courts, with a greater or less degree of explicitness and precision, have yielded assent to views similar to those of Mr. Bishop, and they have occasionally cited him. In one case the information failed to allege an overt act amounting to an attempt to commit a crime. In passing upon the sufficiency of the pleading the court said: "An 'overt act' is one done to carry out the intent, and it must be such as would naturally effect that result. Whether a certain act was in pursuance of the conspiracy depends entirely upon whether the parties conspired to accomplish their purpose by the means alleged. Where a conspiracy to commit a crime is established, any act in pursuance of the conspiracy and to effect its object is sufficient to give the court jurisdiction in the county where the act was committed. It is said that a conspiracy to commit a particular crime is essentially of the nature of an attempt to commit the crime." Portions of the text which we have above set forth from Mr. Bishop's work were then quoted, along with statements substantially to the same effect from Wharton's Criminal Law. The court then said further: "An attempt to commit a crime can only be made under circumstances which, had the attempt succeeded, would have constituted the substantive offense" (*Williams* v. *State,* 16 Okl. Cr. 217 [182 Pac. 718]). In another case the following appears: "It is well settled that the unlawful agreement is the gist of the conspiracy. The unlawful agreement, however, does not become the basis of an indictable offense till one of the parties to such agreement takes a step in furtherance of the execution of it. It is therefore essential, where there is a charge of conspiracy which requires an overt act to be done in execution of it, in order to make the conspiracy indictable, that such overt act should be set out in the indictment. It is not necessary to constitute the offense that it should appear that the object of the conspiracy was attained; a step taken in that direction by one of the parties to the agreement is sufficient. An indictable conspiracy is in its nature an attempt to commit an offense. 2 Bish. on Cr. Law (5th ed.), par. 191." (*State* v. *Hemmendinger,* 100 N. J. Law, 234 [126 Atl. 544].) Although we shall see later that the general trend of decision in the

United States courts is to the contrary, one or two of those tribunals have put forth language similar in effect to that employed in the two opinions of the state courts from which quotation has just been made. In a case in which the defendants were charged with a conspiracy to defraud certain corporations which were engaged in a mail order business, a federal district judge said in his instructions to the jury: "It seems to me that an overt act must be an act which has a tendency at any rate to carry out the object of the conspiracy, or in some way tends to make it effectual. It may not be sufficient of itself to complete the offense, but it should have a tendency to do so. I do not imagine that any letter which could have no tendency to mislead the corporations which are the alleged victims could be claimed to be an overt act at all. It must be an act having a tendency to effectuate the object of the conspiracy" (*United States* v. *McLaughlin,* 169 Fed. 302). From the viewpoint of the question here to be decided, this language is not clear, but it seems to import that an overt act must be more than an act of preparation, as that term is understood when applied to the law of criminal attempts. This view is strengthened by other language contained in the judge's charge to the jury. Another judge of the United States district court has said that "a conspiracy to commit an offense, and an act done in pursuance and to effectuate the object thereof, may easily, if it does not necessarily, comprehend an attempt to commit the crime as to which the conspiracy relates" (*United States* v. *Rachmil,* 270 Fed. 869). These are all the cases which, so far as we can discover, either directly or indirectly, adopt the view of Mr. Bishop that an overt act under the law of conspiracy must partake of the nature of a criminal attempt. We now turn from them for the purpose of exhibiting the reverse side of the shield.

We doubt whether *State* v. *Hemmendinger, supra,* states the law of New Jersey upon the question now under discussion, although we shall not attempt here specifically to resolve the doubt, but shall leave the question to the tribunals of that state, where, of course, it belongs. Certainly, earlier views of the courts of the jurisdiction, expressed in opinions which are not noticed in *State* v. *Hemmendinger,* are at war with the attitude assumed in that case. The following *dictum* appears in an early case: "[An] overt

act may or may not be in itself criminal. The conspiracy is the crime, and the overt act bringing it within the requirement of the statute, *may be a very insignificant affair.* A completed crime is shown on the record before us by the averment of a criminal conspiracy, and the averment of the *doing* of any thing, *no matter what,* in furtherance of it . . . " (*State* v. *Young,* 37 N. J. L. 184.) The italics in the quotation are ours. In another case the supreme court of New Jersey, in passing upon a charge of conspiracy, determined that the indictment sufficiently alleged the commission of an overt act, although under the law of criminal attempts the act so characterized would have been a mere act of preparation. The indictment charged that the defendants had conspired to unlawfully and corruptly procure certain persons to vote at an election in a certain election district, knowing them not to be qualified electors of the district. The court said: "The overt acts pleaded are that the defendants in pursuance of their conspiracy aided and abetted the disqualified persons whom they had conspired to have vote to falsely register their names or the names of others on a certain registry list as persons qualified to vote. It is . . . said that there is no charge that such persons voted or offered to vote . . . If there was a design to procure a disqualified person to vote, followed by an overt act in pursuance of that design, the conspiracy was complete, although for some reason its purpose failed and the person did not actually vote. . . . Respecting the essential act in execution of the joint design required by the statute, we think that the registration is such a step in the assertion of the right to vote, and in the equipment of the person asserting the right, with the privilege of voting, that, where there is a design to vote fraudulently, then a fraudulent registration is an act taken in the execution of that purpose. It follows that the aiding and abetting in the false registration of W. B. was an overt act in carrying into execution the design to procure W. B. to vote at the following election" (*State* v. *Nugent,* 77 N. J. Law 84 [71 Atl. 485]).

At least one decision of the courts of New York casts some light upon the question which now engrosses our attention. The case (*People* v. *Miles,* 123 App. Div. 862 [108 N. Y. Supp. 510], affirmed 192 N. Y. 541 [84 N. E. 1117]) is principally noteworthy because the decision rendered is in

some measure based upon the language of the new Jersey court in *State* v. *Young, supra.*

By far the greater body of the law upon the question now before us is to be found in the decisions of the United States courts. As already hinted, it will be seen that their trend is not in accord with the general expressions contained in the opinions in *United States* v. *McLaughlin, supra,* and in *United States* v. *Rachmil, supra.* In a number of the federal cases, without particular reasons being given for the result, charges of the commission of overt acts have been held to be sufficient where, apparently in some instances, certainly in others, the acts would have been nothing more than acts of preparation under the law of criminal attempts. Those cases are *United States* v. *Sanche,* 7 Fed. 715; *Daly* v. *United States,* 170 Fed. 321 [95 C. C. A. 107]; *Donaldson* v. *United States,* 208 Fed. 4 [125 C. C. A. 316]; *United States* v. *Burke,* 218 Fed. 83; *Witte* v. *Shelton,* 240 Fed. 265 [153 C. C. A. 191]; *Gretsch* v. *United States,* 242 Fed. 897 [155 C. C. A. 485]. There are also, however, cases in which the courts have gone further than merely to uphold charges of that nature. The first of these, so far as our research has enabled us to discover, was decided as early as 1873. The court concluded its opinion thus, italics being ours: "If, then, an indictment correctly charges an unlawful combination and agreement as actually made, and, in addition, describes *any act* by any one of the parties to the unlawful agreement, as an act intended to be relied on to show the agreement in operation, it is sufficient, although, upon the face of the indictment, it does not appear in what manner the act described would tend to effect the object of the conspiracy. It is sufficient, if the act be so described as to apprise the defendant what act is intended to be given in evidence as tending to show that the unlawful agreement was put in operation, without its being made to appear to the court, upon the face of the indictment, that the act mentioned is necessarily calculated to effect the object of the unlawful combination charged. *It is not the case of an attempt to commit crime.* The crime is committed when the combination is made, and the act of one of the conspirators is not required by the statute to show the intent. That is inferred from the unlawful act of combining to defraud, or to commit an offense, but the object of requiring

proof of *some act* in furtherance of the unlawful agreement is, to show that the unlawful combination *became a living, active combination*" (*United States* v. *Donau,* Fed. Cas. No. 14,983). This pioneer adjudication has been cited and followed in *United States* v. *Benson,* 70 Fed. 591 [17 C. C. A. 293] ; *Bantt* v. *United States,* 108 Fed. 61 [47 C. C. A. 210] ; *United States* v. *Greene,* 115 Fed. 343; *Ex parte Black,* 147 Fed. 832; *United States* v. *Shevlin,* 212 Fed. 343; *Collier* v. *United States,* 255 Fed. 328 [166 C. C. A. 498]. Two of these cases made substantial addition to the language employed in the opinion of *United States* v. *Donau.* "The policy of Congress was, not to introduce a new element into the crime, but to allow a period of grace, an opportunity for repentance, after the plot had been perfected, and before any decisive act had been done in furtherance of it. Therefore, the courts are required to differentiate sharply *between the agreement per se* [italics ours] and acts in furtherance of the agreement" (*Ex parte Black*). "To complete the crime denounced by the statute there must be *some action* in addition to *the mental one* of jointly agreeing or assenting to participate in the commission of the crime. Nothing in the language of the statute indicates an intention to require that additional action be calculated or have a tendency to accomplish the object of the conspiracy. It is enough if it is done with the purpose or intention of putting *the unlawful agreement into operation,* whether it is or is not effective towards that end" (*Collier* v. *United States*). The italics are ours.

We have now given the result of our research among the adjudications of outside jurisdictions which touch upon the question here under scrutiny. If we turn to the opinions of our own courts we find nothing which materially aids us in our quest. In *People* v. *Daniels,* 105 Cal. 262 [38 Pac. 720], it happened that the overt act alleged and proved amounted to an attempt to commit the crime which was the object of the conspiracy. *People* v. *Compton,* 123 Cal. 403 [56 Pac. 44], is not a conspiracy case. Both *People* v. *Johnson,* 22 Cal. App. 362 [134 Pac. 339], and *People* v. *Cory,* 26 Cal. App. 735 [148 Pac. 532], relate to phases of the law concerning overt acts in conspiracy cases, but neither of them touches the present question. In *People* v. *Beck,* 60 Cal. App. 417 [213 Pac. 61], the overt acts alleged

apparently would have been nothing more than acts of preparation under the law of attempts. The allegations were held to be sufficient, but the specific question now under investigation was not discussed. The overt act charged in *People* v. *Rodriguez*, 61 Cal. App. 69 [214 Pac. 452], was an attempt to commit the crime contemplated in the formation of the conspiracy. *People* v. *Silbelo*, 61 Cal. App. 92 [214 Pac. 462], was a companion case with *People* v. *Rodriguez.*

It becomes material now to examine the statutes of other jurisdictions making necessary the commission of overt acts in conspiracy cases before criminality will attach, in connection with section 184 of our Penal Code. The latter enactment, it will be remembered, provides: "No agreement amounts to a conspiracy, unless some act, beside such agreement, be done . . . to effect the object thereof . . . " The statute of Oklahoma is to the effect that "the crime of conspiracy to commit a felony or misdemeanor is not complete 'unless some act besides such agreement be done to effect the object thereof . . . ' " (*Williams* v. *State, supra*). The New Jersey enactment provides, in part, that "no agreement to commit any offense other than [certain designated ones] shall be deemed a conspiracy unless some act in execution of such agreement be done to effect the object thereof . . . " (*Wood* v. *State,* 47 N. J. L. 180). The cognate section of the Penal Code of New York is to this effect: "No agreement except to commit [certain specified crimes] amounts to a conspiracy, unless some act besides such agreement be done to effect the object thereof . . . " (*People* v. *Miles, supra*). The enactment upon which most of the decisions of the United States courts are based, although some of them relate to special statutes concerning the law of conspiracy, reads, in part: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States . . . and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable . . . " (Rev. Stats. U. S., sec. 5440). Two of these foreign enactments, those of Oklahoma and New York, are practically identical with section 184 of our Penal Code. It requires no extended examination or argument to justify the assertion that the other two, those of New Jersey and the

United States, although couched in somewhat different language, are not different from ours in legal effect. All of the cases which we have cited are therefore in point and we may follow that one of the opposing lines of decision which appears to us to be in accord with the better reason.

[2] It is plainly apparent from the list of cases we have spread upon the foregoing pages that the weight of authority is to the effect that, in pleading an overt act under the law of conspiracy, an information or indictment need not aver an attempt to commit the crime which is the object of the conspiracy and that the text of Mr. Bishop, and perhaps of other law-writers, to the contrary is unjustified and incorrect. Does the better reason lie in the same direction?

[3] Before proceeding to a line of argument which to our minds positively demonstrates the necessity of an affirmative answer to the question, we shall pause to consider the language of section 184 of the Penal Code, which seems to lead to the same end. That enactment, with a resort to italics, provides that no agreement "amounts to a conspiracy, unless *some act, beside such agreement*" be done to effect the object of the agreement. With these words before us, it seems extremely doubtful that the "some act" required by the law to stamp the agreement with criminality must be an attempt to commit the offense contemplated by the conspirators. The overt element of the crime, in so far as it is an element therein, is not to be merely "some" act, but it must be, as well, an act "beside" the agreement. Does not this concatenation of words indicate a legislative intent merely to distinguish, or to draw a line, between the mental activity evident in the meeting of the minds of the conspirators and the first outward manifestation of an intent to put into operation their concord upon the illicit purpose of the conspiracy—their first "act"? The fact that the overt act must tend to "effect the object" of the agreement does not interfere with an affirmative answer. Every act of the conspirators in and about the subject matter of the conspiracy, even an act which under the law of criminal attempts would be but an act of preparation, must in some degree tend to effectuate the object of the illicit enterprise. In truth, the meeting of the minds of the conspirators, even if strictly not an act, tends toward the consummation of the unlawful purpose. It is the first step, the first movement, taking both

these words in a figurative sense, toward the object of the wrongful concord. The situation is this: The meeting of the minds is a mental phenomenon. The overt manifestation must be physical. It seems to us that there is great reason, from the very language of section 184, for adopting the view that the legislature intended to draw a line between the mental phenomena exhibited in the formation of the agreement and the first nonmental, the first physical and therefore the first outward, manifestation by any conspirator of the will to put the illicit purpose of the conspiracy beyond the terms of thought and into terms of action—to make it, in the language of one of the United States courts, "a living, active combination."

We come now to what we deem a controlling and conclusive consideration in the solution of the question to which we have given such extended attention. If the position of appellant, based upon the text of Mr. Bishop, be a tenable one the law of conspiracy becomes a dead letter, as an effective instrumentality for the punishment, *as conspirators*, of those who engage in unlawful combinations. This is a startling statement. We must at once explain its meaning and establish its truth. [4] It is evident that under the terms of section 184 of the Penal Code the agreement or combination is the gist of a criminal conspiracy. The negative mandate of the section, if we may employ a contradiction of terms, that "no agreement amounts to a conspiracy" unless an overt act be performed in furtherance of it, must surely, when an overt act *is* performed, resolve itself into the affirmative that the *agreement* thereupon amounts to a conspiracy. This view is in accord with the law in the jurisdictions generally in which the performance of an overt act is necessary to fasten criminality upon those who conspire to consummate a forbidden purpose. At common law the combination was the gist of the conspiracy. Under the authorities the situation is not changed by statutes requiring the performance of an overt act in order to complete the crime. The agreement is still the gist of the offense. The decisions of the United States courts upon this particular point, a few of which are among those cited above, but many more of which are not cited, are uniform in their effect. With the adoption of appellant's view all this is changed. It is not too much to say, as we have already said,

that the law of conspiracy, properly so called, then practically disappears. The requirement that there be an overt act is no longer an innovation in the law of conspiracy. It but works an extension of the law of attempts and makes operative an innovation in that law. The attempt becomes the gist of the offense contemplated by the change in the law and the attempt is the real crime. Therefore, strictly speaking, the combination or agreement is no longer a conspiracy in the older sense, but is merely a means provided by law whereby a group of individuals may be so tied together that they all may be punished for a plain and ordinary "attempt" committed by any number of them less than all. Such is the effect—not only the effect, but the indubitable meaning—of the statement of Mr. Bishop that "the conspiracy is punishable simply because it is an attempt." We cannot perceive that the legislature has employed language apt to work such a result. We are convinced that the better reason accompanies the weight of authority upon the question now under examination.

[5]  We are therefore satisfied that the indictment before us is amply sufficient in the face of the attack upon it with which we have dealt. Many "acts" are charged in it, following the allegation that they were done after the illicit combination "and in the course of said conspiracy and in furtherance thereof." These acts are, in part, at least, the taking out of the insurance policy; the procuring of the boat, the "Catalina Flyer," from McAfee; the procuring of the garb with which to disguise Wilcy; and the embarkation upon the "Catalina Flyer." We are satisfied that these allegations, taken together, and without pointing to any one act which is alleged, as distinguished from the remainder, meet completely the requirements of section 184 of the Penal Code.

[6]  It is contended by appellant that the indictment is uncertain in that it cannot be ascertained therefrom whether the defendants were charged with a conspiracy to commit the crime denounced by section 532 of the Penal Code, or to commit the crime punishable under section 549 of that enactment. The demurrer to the indictment presented only the general ground. It is therefore extremely doubtful whether the point now urged is properly before us, but we do not decide that particular question. The penalties pre-

scribed by the two sections mentioned are different and, therefore, if there be such an uncertainty in the indictment as that which is claimed to exist, the substantial rights of appellant are affected by it. For that reason, and because the attorney-general has joined issue with appellant in argument of the question suggested, we shall for the purposes of this case, only, concede that it is properly before us and shall decide it. The point presented is one of substantial moment. Section 182 of the Penal Code "denounces the crime of conspiracy to commit particular offenses, and indictments under it must be so framed as to point out the separate offense which persons are charged with conspiring to commit" (*People* v. *Barnard,* 63 Cal. App. 562 [219 Pac. 756]). Section 532 of the Penal Code reads, in part: "Every person who . . . , by any false or fraudulent representation or pretense, defrauds any other person of money, . . . and thereby fraudulently gets possession of money . . . , is punishable . . . " Parts of section 549 are as follows: "Every person who presents . . . any false or fraudulent claim, or any proof in support of any such claim, upon any contract or policy of insurance . . . for the payment of any loss, or who prepares, makes or subscribes any account, . . . proof of loss, or . . . writing, with intent to present or use the same . . . in support of any such claim, is punishable . . . " A brief survey of the indictment will convince that it charges a conspiracy to violate the provisions of one of these sections and not of the other, in fact, that there is nothing substantial in it to indicate a purpose to base the charge upon the terms of that other. Viewed as a pleading founded upon section 532 it will be observed that the indictment charges a conspiracy "to obtain money and property by false pretenses . . . as follows, to-wit: That . . . said defendants . . . did . . . conspire, . . . by divers unlawful, false and fraudulent representations and pretenses to obtain the sum of ten thousand dollars . . . upon the false and fraudulent representation and pretense" that John Dexter Wiley had been drowned and that Belle Wiley was entitled to receive the sum mentioned as proceeds of the policy of insurance which had been issued. Then follow the allegations showing the various things done pursuant to the conspiracy, including the following: That two of the conspirators induced McAfee to allow them to

use the "Catalina Flyer" "for the purpose of making a false, fraudulent and fictitious showing and representation" that Wiley had been drowned; that several things were done for the purpose of assisting the conspirators "in effectuating and making the said false and fraudulent claim to the" insurance company that Wiley had been drowned; that during the cruise of the "Catalina Flyer" Belle Wiley did "falsely and fraudulently represent and pretend" to those on the boat that Wiley had fallen overboard; and that Wiley then made the same false and fraudulent representation and pretense. Viewed as an effort to charge a conspiracy to violate the provisions of section 549 the indictment is barren. The most that can be said of the pleading on that head is that in it the word "claim," a word also found in section 549, is employed. That circumstance, considering the manner and the connection in which the word is used, is utterly insufficient to make it a charge founded upon that section. Taking the indictment as a whole, it appears to us plainly, singly and with certainty to charge a conspiracy to violate the terms of section 532. There is nothing in it which could have misled appellant to the view that the charge was based upon section 549.

[7] It is contended that at the trial there was no evidence of the formation of the conspiracy. On the contrary, however, the evidence of the conspiracy was unusually full and complete. It is often difficult to make proof of the formation of the unlawful combination in conspiracy cases, but that difficulty was not experienced in any marked degree in the present instance. There was ample evidence from which the jury was justified in finding that the following was the sordid story of the unusual and bizarre crime charged in the indictment: Appellant, introducing himself under the assumed name of Spear, opened negotiations with McAfee for the use of the "Catalina Flyer" and for the services of McAfee himself, who was the captain of the boat, in the consummation of the illicit enterprise. The pretended Spear, after a preliminary and introductory exchange of remarks, asked the captain if he desired to make two thousand dollars easy money. The skipper inquired how he could enrich himself to that extent. Appellant then said that he was connected with an insurance company, that he had a party who was insured and that, to quote McAfee,

"he [the insured] wanted to go around the island with me on my boat and pull off a fake drowning, and with my reputation there," McAfee having lived on the island of Catalina for eighteen years, "if I reported him as drowned, you know, the money would be paid in the neighborhood of forty-eight hours after the case was taken into their office, and that after the money was paid from the insurance company that I would be paid $2,000 in Liberty Bonds." McAfee said he would think the proposed plan over. The two had dinner together on the evening of the day of this first meeting, when McAfee says that appellant "continued his talk on what the case would be, in regard to having a man that he had insured, and the man apparently would fall overboard." During this second conversation appellant referred to the insured man as one Cameron. Appellant said to McAfee that he would take up the matters they had talked about with Cameron. McAfee later had conversations with appellant and Wiley together, but in the meanwhile McAfee had made the authorities acquainted with the pending plot and it was arranged that he should appear to fall in with the plans of appellant and Wiley and that he should apparently aid in the monstrous scheme to defraud the insurance company. From that time forward the conspiracy proceeded under the surveillance of officers of the law. At the conversations between appellant, Wiley and McAfee, details were arranged for the carrying out of the plot. Mrs. Wiley, who has not yet appeared in this story of the unfolding of the plot, was to play an important part in the consummation of the plan, under the arrangement made by the three men. We shall not describe the plan, but shall proceed to relate what was done pursuant to it, as McAfee testified that it was carried out as contemplated. It is well to say here, by way of interpolation, that during the conferences between the three men appellant and Wiley disclosed to McAfee their true names. Some days before Wiley was to be "drowned" he and McAfee went to sea in the latter's boat and put on a "dress rehearsal" of the prospective descent of Wiley into a watery grave. Finally, and after all these preliminaries, the great day arrived. The stage was set, the actors were in their places, and the calcium threw its spot on the scene of histrionic endeavor. Even an "audience" was present, for the "Catalina Flyer"

was an excursion boat and the general public was not on this occasion denied the right to partake of the joys of the cruise. Some of the audience knew that the trip was to be enlivened by the production of a "farce," to lapse again into the language of the "boards," for several detectives, thoroughly interested "first-nighters," were in the loges and boxes. Appellant was also present at the "production." All that now occurred followed closely the "script" of the play, as composed by Messrs. George, Wiley and McAfee. A number of the excursionists, including Wiley and his wife, were on the forward deck of the boat, when McAfee ordered them all aft and below. This was done for the alleged reason that the weather had become so rough as to make the position of the forward passengers dangerous. All obeyed the order, but Mrs. Wiley left behind her a purse which she had been carrying. When all the forward passengers were settled aft, Mrs. Wiley conveniently "discovered" that the purse was missing. She exclaimed that she had left·it forward and rushed to obtain it. She was accompanied by her husband, who, like the redoubtable Dick Deadeye in "Pinafore," another epic of the sea, was vigilant to aid "a female in distress." When the leading man and the leading woman reached their position up stage, Wiley threw overboard two chairs, the purse, and a straw hat which he had worn and which had the initials of his name inside it. But Wiley did not himself plunge into the raging main. Not he! The "drowning" was not to approach that near to realism. Instead, he plunged down the forward hatchway, which had been left open for the purpose, and hid himself in the forward part of the vessel. The other actors in the drama proceed with their parts. Mrs. Wiley runs aft in tears, actual or apparent, calling out that her husband has fallen into the sea. McAfee yells "Man overboard!" and "brings to" the boat. They cruise about the spot for a time, to the accompaniment of the lamentations of Mrs. Wiley—and McAfee says she played well her part—and amid the great confusion which reigns among the passengers; but as they have the "body" of Wiley with them they do not find it in the water. They do, however, fish out the initialed hat, as mute evidence of this latest catastrophe of the sea! After a time the boat returns to Avalon, the port of Catalina Island, apparently Wileyless.

The passengers, no male Wiley among them, are put ashore in a small boat. Mrs. Wiley is cared for in the hour of her bereavement by some of the kindly disposed passengers and they eventually escort her to the mainland. After the coast is clear McAfee returns to the "Catalina Flyer" and takes off Wiley in disguise. That individual also proceeds to the mainland, where he finds appellant awaiting him. There they are both put under arrest. Could there have been plainer proof that appellant and Mr. and Mrs. Wiley had conspired as charged in the indictment? If there could be plainer proof, it was not necessary. There was enough. It was of course proved, in addition to what is above set forth, that the insurance policy was taken out as charged, that the life of Wiley was insured under it, and that Mrs. Wiley was the beneficiary.

[8] It is contended that the trial court erred in giving an instruction to the jury to the effect that the defendants were to be found guilty if the jury was satisfied beyond a reasonable doubt that the illicit combination was formed, for the reason that the particular instruction did not inform the jury as to the necessity of proof of an overt act. There are two answers to this objection: 1. Other instructions which were given by the court properly covered the law as to overt acts; 2. The uncontradicted evidence was so complete upon the subject of overt acts that the jury could not have found that no overt act was committed.

Various other points are made by appellant. They are, however, answered by what we have already said, or they fall of their own weight. It is particularly to be noted that the error of Mr. Bishop, doubtless justifiably concurred in by appellant's counsel, runs through and colors most of the questions presented upon the appeal.

Judgment and order affirmed.

Finlayson, P. J., and Craig, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on November 27, 1925.