Filed 2/3/15  P. v. Williams  CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CEDRIC DALE WILLIAMS,<br><br>    Defendant and Appellant. | D066230<br><br><br><br>(Super. Ct. No. FSB1100344) |


APPEAL from a judgment of the Superior Court of San Bernardino County, Kyle S. Brodie, Judge.  Affirmed.


Lynda A. Romero, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Lynne McGinnis and Elizabeth M. Carino, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Cedric Dale Williams of second degree robbery (Pen. Code,[1] § 211; count 1), sexual penetration by a foreign object (§ 289, subd. (a)(1); count 2) and attempted murder (§§ 187, subd. (a) & 664; count 3). As to all counts, the jury found true a principal of Williams was armed with a firearm (§ 12022, subd. (a)(1)) and Williams personally used a firearm (§ 12022.53, subd. (b)). As to count 3 only, the jury also found true Williams personally used a firearm (§ 12022.5, subd. (a)), personally discharged a firearm (§ 12022.53, subd. (c)), personally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)), personally inflicted great bodily injury (§ 12022.7, subd. (a)) and committed the offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). The court sentenced Williams to an indeterminate term of 25 years to life and to a determinate term of 38 years four months.

On appeal, Williams contends his conviction on counts 1 and 2 must be reversed because defense counsel was ineffective when counsel did not move to exclude identification testimony from victim Jane Doe that Williams contends was based on unduly suggestive pretrial identification procedures. As we explain, we disagree with this contention and thus affirm the conviction on counts 1 and 2.

FACTUAL AND PROCEDURAL OVERVIEW

A. *Counts 1 and 2*

In mid-December 2010, Doe and her friend were walking through an empty field near her home in the City of Highland when she heard footsteps and the next thing she knew, a man came from behind, wrapped his arm around her neck and put a silver gun

---

[1]     All statutory references are to the Penal Code.

inside her mouth. At the same time, the man's accomplice pointed a black gun at her friend. The man told Doe, "Give me what you got." At gunpoint, Doe gave the man cigarettes, keys to her home, her ID, some change and a piece of paper containing her then current address.

Next, the man fondled Doe's breasts, including her nipples. The man then licked two of his fingers and, while facing Doe, twice digitally penetrated her vagina. After the man made a derogatory comment to Doe about the licking, the attackers demanded she and her friend take off their shoes and socks. The attackers then ran off yelling, "Spook Town Piru."

After the robbery and sexual assault, Doe went home, took a shower and then sat in a tub with bleach because she felt "dirty." Doe did not then report the crime to the police because her attackers knew where she lived and she worried they would cause her and/or her family further harm.

B. *Count 3*

A few days later, Daniel Henderson was walking through the same field where Doe and her friend had been attacked. Henderson was on his way home from the store when Henderson saw a man he later identified as Williams. Henderson had seen Williams many times before, including at Henderson's apartment complex, where Henderson lived with his wife and three daughters.

As they passed each other, Henderson heard the man say, "What's up?" in an angry tone. As Henderson kept walking, the man said, "Hey cuz, hey cuz" and when Henderson turned around, the man was close behind him. Feeling nervous and uneasy, Henderson took a few steps toward the man because Henderson did not like the man

3

following him.  The man told Henderson he was a member of the "Spook Town Crips."  Henderson noticed one of the man's hands was hidden under a hoodie, by the man's waistline.

The man pulled out a gun from his waistline and pointed it at Henderson.  As the man continued to ask Henderson what he was looking at, Henderson apologized and told the man he was not in a gang and meant no disrespect.  The man in response cocked the gun and said to Henderson, "Get out of here you . . . old-ass nigger."  Unarmed, Henderson started walking away.  As he did, his right bicep was hit by a bullet.  When Henderson looked at his arm, he saw the man shooting at him.  Henderson heard two more gunshots and realized he had been hit in the femur and the buttocks.  Henderson's left leg broke from underneath him and he fell to the ground.  Henderson dragged himself to the edge of the field where he remained until help arrived.

About 20 or so people came to Henderson's assistance.  One person called 911.  As relevant here, another person that witnessed the Henderson shooting was Doe, who according to Henderson was wearing a long white T-shirt on the night he was shot.  As he lay on the ground, Doe walked across the street and told Henderson she knew his attacker.  Specifically, Henderson testified she told him, "that guy robbed me the other day -- the other night."

On the evening Henderson was shot, Doe was on her way to visit a friend.  As she walked, Doe saw a man standing by a telephone pole near the field where she had been attacked.  Doe believed the man was the "same person who had robbed [her], maybe, two or three days before."  Doe recognized the man based on his clothing, hair and stature.  Scared, Doe started walking faster when she heard gunshots and saw the man by the

4

telephone pole shoot another man holding a bag (i.e., Henderson). According to Doe, the man holding the bag was unarmed. Doe testified she walked over to the injured man and said, "the person that shot you, that was the person that robbed me a couple of days ago."

The 911 call was played for the jury. In response to the 911 operator's request for a description of the shooter, Doe was heard in the background saying, "I know who he is, that's the same guy, he just robbed [me] just the other night." During the same 911 call, as Henderson was telling the operator his assailant was wearing a hoodie, Doe was also heard saying the man was a "black guy" and something about a "silver gun." Shortly thereafter, the woman who called 911 gave the phone over to Doe, who engaged in the following exchange with the 911 operator:

"JD [Jane Doe]: Hello.

"911: Hi ma'am, did you see the guy at all?

"JD: Yeah you know what, this is, not last night but the night before he robbed me. It was the same guy.

"911: So the same guy . . .

"JD: Yes.

"911: Tried to robbed [*sic*] you that shot this guy?

"JD: No, he did, he did rob me.

"911: He did rob you.

"JD: He did rob me.

"911: Do you know his name?

"JD: No I don't.

"911: Okay.

5

"JD: But you know what, they are always in this field."

When Deputy Sheriff Earl Seratt arrived at the scene of the shooting, he spoke to Doe. Doe appeared to be "scared and excited at the same time." Doe told Deputy Seratt that the shooter "was the same suspect that was involved in her robbery." Doe then gave Deputy Seratt a description of the suspect and repeated the shooter was the same person who robbed her a few days before. When Deputy Seratt asked Doe for the police report number in connection with the robbery, Doe said she did not know it and provided few other details regarding the crime.

C. *Gang Evidence*

Detective Mark Perez appeared as the prosecution's gang expert. Detective Perez stated the Spook Town Crips is a criminal street gang from Compton that began in the 1960's and is comprised of about 80 to 100 members. The Spook Town Crips are also known as "Spook Town," and the gang uses the symbols "S" and "T" for "Spook Town" and "S-T-C" for "Spook Town Crips."

Detective Perez opined that Williams was an active participant in the Spook Town Compton Crips when he committed the instant offenses and that the reputation of both Williams and the gang itself were enhanced as a result of a Compton gang member committing a crime in the City of Highland. Detective Perez explained Williams's identification of his gang affiliation before he shot Henderson benefited the gang because it instilled fear in the community, which makes it harder for law enforcement to obtain the cooperation of the community as people are "intimidated, afraid for their life [and the] safety of their family," making it easier for the gang to commit more crimes.

6

Indeed, Detective Perez opined that often victims of gang-related crimes do not cooperate with law enforcement out of fear of gang retaliation: "That's a regular occurrence in my line of work, in working the gang team. It's very hard to get witnesses, victims to cooperate. They are afraid. It's usually always the witnesses. I'm afraid I'm going to get retaliated on. They know where I live. They know my family, their kids -- know my kids. . . . It's very, very hard to get[] the community to cooperate."

Police Officer Jason Heilman appeared as a prosecution witness. Officer Heilman stated he contacted Williams in mid-May 2010 in the vicinity where the instant crimes occurred. During the contact, Williams admitted he was a member of the "Spook Town Compton Crips." Williams had tattooed on his arms an "S" for "Spook," a "T" for "Town" and the words "Hub city," which is commonly used by Compton gang members. On his chest, he had tattoos of an "E" and an "S" representing "East Side Compton" and the words "Cripping Ain't Easy, Pimping Ain't Hard." Williams also had a tattoo that read, "Straight Out of Compton," which also depicted a gun. According to Detective Perez, a gang member with a tattoo of a gun "usually represents or has a reputation for carrying a firearm," and shows the gang member is "not afraid to use a firearm."

D. *The Defense*

Williams testified in his own defense. He denied robbing and sexually assaulting Doe and provided an alibi, who also testified in his defense. With regard to the shooting, Williams admitted shooting Henderson but said it was in self-defense. Specifically, Williams said that as he walked past a man he later identified as Henderson, the man became annoyed and started questioning Williams about some "bad" drugs and said he wanted his money back. Although Williams had seen the man before, Williams had not

7

sold the man any drugs. Not wanting any problems, Williams told the man, "get your old ass out of here." As Williams continued to walk, he turned around and saw the man pull a black revolver out of his hoodie. Fearing for his life, Williams pulled out his own gun, fired at the man and then ran away.

E. *Rebuttal*

Henderson testified he did not accuse Williams of selling bad drugs on the night of the shooting. He also did not have a gun that night. Henderson's wife also testified there were no guns in the family home.

DISCUSSION

As noted, Williams contends his conviction on counts 1 and 2 must be reversed because defense counsel was deficient in failing to move to exclude Doe's identification of Williams in what he contends was an unduly suggestive pretrial identification procedure. Williams also contends defense counsel's error was prejudicial because Doe's testimony regarding her pretrial photo identification of Williams allegedly was the "only evidence" tying Williams to counts 1 and 2, inasmuch as Doe was unable to identify Williams in court (and at the preliminary hearing) as her attacker.

A. *Guiding Principles*

""A criminal defendant is guaranteed the right to the assistance of counsel by both the state and federal Constitutions. [Citations.] 'Construed in light of its purpose, the right entitles the defendant not to some bare assistance but rather to *effective* assistance.'" [Citations.] It is defendant's burden to demonstrate the inadequacy of trial counsel. [Citation.] [The California Supreme Court has] summarized defendant's burden as follows: "'In order to demonstrate ineffective assistance of counsel, a defendant must

8

first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, [the defendant] must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."'" [Citation.] [¶] Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." [Citation.] Defendant's burden is difficult to carry on direct appeal, as we have observed: "Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission.'" [Citation.]' [Citation.]" (*People v. Vines* (2011) 51 Cal.4th 830, 875–876.)

In determining "'whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the

9

identification. [Citations.]' [Citation.] If the answer to the first question is 'no,' because we find that the challenged procedure was not unduly suggestive, our inquiry into the due process claim ends. [Citation.]" (*People v. Virgil* (2011) 51 Cal.4th 1210, 1256; see *People v. Avila* (2009) 46 Cal.4th 680, 698 [to successfully challenge lineup evidence a defendant must first establish that the lineup procedure was unduly suggestive and then establish the resulting identification was unreliable under the totality of the circumstances].)

A defendant "'has the burden of showing that the identification procedure was unduly suggestive and unfair "as a demonstrable reality, not just speculation." [Citation.] . . . . [¶] . . . '[A]n identification procedure is considered suggestive if it "caused defendant to 'stand out' from the others in a way that would suggest the witness should select him." [Citation.]' [Citation.]" (*People v. Johnson* (2010) 183 Cal.App.4th 253, 271–272.)

B. *Deficient Performance*

Here, we conclude defense counsel was not ineffective for failing to object to, and moving to exclude in connection with counts 1 and 2, the testimony of Doe identifying Williams in a pretrial photographic lineup as her attacker. The record shows it would have been futile for defense counsel to object to this testimony because there is more than sufficient evidence in the record to support the finding the pretrial photographic lineup was neither unduly suggestive nor, in any event, unreliable under the totality of the circumstances. (See *People v. Virgil*, *supra*, 51 Cal.4th at p. 1256.)

1. Suggestibility

Deputy Sheriff Art Alvarado testified that about three or four weeks after the robbery and sexual assault, he showed Doe a photographic lineup. Doe did not want to meet Deputy Alvarado at her home because she was concerned it would appear to others she was cooperating with law enforcement and because she was not living on a "very law-enforcement friendly" street.

Deputy Alvarado showed Doe the photographic lineup, which was marked as Exhibit 1 at trial and which is included in the record on appeal. Before showing Doe the photographic lineup, Deputy Alvarado read and gave Doe a standard written admonishment. It provided that while it was important to identify someone involved in a crime, "[i]t's always as important not to pick someone if they're not involved," and that "clothing can change, hairstyles can change [and] facial hair can change."

Deputy Alvarado testified Doe became "very, very emotional, scared and emotional" and started crying as she viewed the photographic lineup, saying, "Oh my God, this is the guy that robbed me and shot the guy." Doe told Deputy Alvarado she had been afraid to report her attack to law enforcement because she was frightened her assailant "was going to come back. He [i.e., her attacker] took her keys and other property. She [i.e., Doe] was afraid that he was going to come back and get her if she cooperated with law enforcement." Doe identified Williams in number 5 as her attacker, circled his picture and placed her initials under the picture.

Deputy Alvarado testified at no time did he tell Doe who to look at in the photographic lineup or otherwise attempt to influence her. He also testified Doe did not choose any other individual in the photographic lineup other than number 5, including the

11

individual in number 1. If Doe had chosen an individual other than number 5, Deputy Alvarado testified he would have asked Doe to circle and initial that particular individual's picture.

The record shows Doe's testimony of this event varied somewhat from Deputy Alvarado's testimony. Doe testified that she in fact identified Williams in number 5 as her attacker. However, she also testified she was no longer certain Williams was the same person she saw a few days later shoot the man (i.e., Henderson) in the field where she had been attacked, noting that to her "all black people look the same" and that she was then "frightened of [her] shadow."

Doe testified when shown the photographic lineup she initially told Deputy Alvarado that number 1 was "similar" to her attacker. According to Doe, Deputy Alvarado told her to look at the lineup "good," "see if I see anybody else" and imagine her attacker without a ponytail and braids.

However, the record shows when asked (on cross-examination) whether her identification of Williams in number 5 was at the time *not* a "true reflection" of her opinion that Williams was in fact her attacker, Doe stated, "I don't recall." Doe also testified that Deputy Alvarado neither "force[d]" nor "influence[d]" her to pick number 5 from the photographic lineup and that she was truthful with Deputy Alvarado when she identified her attacker as number 5.

What's more, when testifying Doe pointed out at one point she was afraid to be home because some "black people" had been looking for her who claimed to have met her at a "tire shop," which she claimed never happened. Doe also confirmed she did not want to meet Deputy Alvarado at her apartment to view the photographic lineup because

12

that would give the impression she was cooperating with law enforcement and doing so would put her "life in danger."

In light of the somewhat conflicting testimony on the issue of suggestibility, or lack thereof, and the testimony of Doe that she was putting her life in danger by cooperating with police, we conclude it was for the jury to decide whether Doe was being evasive and untruthful when she testified that "all black people look the same" and that Deputy Alvarado allegedly suggested she continue looking at the photographic lineup after she initially said number 1 was "similar" looking to the man who attacked her in the field. (See, e.g., *People v. Gunder* (2007) 151 Cal.App.4th 412, 420 [noting a witness "feigning memory loss is in fact subject to cross-examination, providing a jury with the opportunity to see the demeanor and assess the credibility of the witness, which in turn gives it a basis for judging the prior hearsay statement's credibility"]; *People v. Beck* (1923) 60 Cal.App. 417, 420 [noting it "was for the jury to determine whether the witness was deficient in memory or willfully evasive" when the witness responded to many of the prosecutor's questions by saying "'I don't remember'"].)

As such, we conclude on this record defense counsel was not deficient in moving to exclude Doe's testimony identifying Williams as her attacker because such a motion would have been futile. (See *People v. Reynolds* (2010) 181 Cal.App.4th 1402, 1409 [noting "trial counsel is not required to make frivolous or futile motions, or indulge in idle acts"].)

In addition, we have independently examined Exhibit 1 and conclude the photographic lineup itself was not unduly suggestive. (See *People v. Gonzalez* (2006) 38 Cal.4th 932, 943 [noting a de novo standard of review applies to a claim that an

13

identification procedure is unduly suggestive].) All of the males in the lineup are African American; all appear to be the same approximate age; all have facial hair (including goatees); all have the same complexion and general facial expression; and all have their eyes open and their mouths closed. Moreover, each of the photographs depicts a male from the shoulders up; each is in color; and each was taken against a neutral background. (See *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1082 [noting that where 'photographs in a lineup are of males of the same ethnicity and 'generally of the same age, complexion, and build, and generally resembling each other,' and where the accused's 'photograph did not stand out, and the identification procedure was sufficiently neutral,' the lineup is not impermissibly suggestive"].)

Thus, there is no basis to conclude the photographic lineup caused Williams to "'stand out' from the others in a way that would suggest the witness should select him." (*People v. Gonzalez*, *supra*, 38 Cal.4th at p. 943.) For this separate reason, we conclude defense counsel was not ineffective in failing to move to suppress Doe's identification of Williams as her attacker based on the photographic lineup. (Contra, *People v. Nation* (1980) 26 Cal.3d 169, 174, 179-180 [noting defendant received ineffective assistance of counsel when defense counsel failed to seek an adjudication of the admissibility of identification testimony based on the "extraordinary suggestiveness" of the pretrial identification process when three girls together went to a police station, after a man had pointed a gun at them and took one of the girls into some nearby bushes and had raped her, when one of the girls identified defendant in a mug shot as the attacker and then informed the other two of her finding, who then, after some discussion, all agreed defendant was the attacker despite the fact the victim had been considering another

14

suspect's photograph, and when the police thereafter gave the girls *only* defendant's photograph to take home to show other possible witnesses].)

2. Reliability

We separately conclude defense counsel was not ineffective in failing to move to exclude Doe's identification of Williams as her attacker because, even assuming the identification procedure was unduly suggestive, we conclude from the totality of the circumstances the identification was nevertheless reliable. (See *People v. Virgil*, *supra*, 51 Cal.4th at p. 1256.)

The record shows that although the man came from behind and grabbed Doe around the neck, during the sexual assault the man was facing Doe when he licked his fingers and twice digitally penetrated her vagina. Thus, the record shows Doe had the opportunity to view her attacker at the time of the offense, which Doe estimated lasted about two or three minutes. (See *People v. Virgil*, *supra*, 51 Cal.4th at p. 1256.)

In addition, the record shows a few days after the attack Doe saw the *same* man near the *same* field where she been attacked. On the night of the shooting, Doe became frightened after she saw her attacker standing near a telephone pole near the field. When Doe started to walk away, she saw the man shoot Henderson. Immediately after the shooting, Doe went up to Henderson and identified Henderson's attacker as the *same* man who had robbed her a few days earlier.

Adding additional credibility to her identification of Williams as her assailant, as noted *ante* Doe then spoke to the 911 operator about not only the shooting but about the robbery a few days earlier. This conversation was recorded and played for the jury. The record shows Doe was *then* unequivocal in identifying her attacker and the shooter as the

15

*same* man.  The record shows Henderson identified Williams as his attacker based on a pretrial photographic lineup and at trial, and this independent identification, in light of Doe's earlier identifications and her fear of gang reprisal, strongly support the finding Doe's identification of Williams as her attacker from the photographic lineup was reliable.  (See *People v. Virgil*, *supra*, 51 Cal.4th at p. 1256.)

C. *Tactical Purpose*

In addition, we conclude the record here amply demonstrates defense counsel had a rational tactical purpose for not moving to exclude Doe's testimony identifying Williams in the photographic lineup as her attacker.  "Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' (*Strickland v. Washington* (1984) 466 U.S. 668, 689.)  Defendant's burden is difficult to carry on direct appeal, as we have observed: "'Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission.'" [Citation.]"  (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437.)

Here, the record shows the defense repeatedly attacked Doe's credibility.  Defense counsel argued during closing that Doe was not a reliable witness because she waited a few days to report the attack, and did so only after witnessing the shooting of Henderson; that she had difficult identifying people of a different race, which the defense explained was "human nature"; and that she was under substantial stress during the attack because

16

the assailant put a gun inside her mouth and sexually assaulted her, thus making identification of her attacker less reliable.

Perhaps more importantly, the defense also argued that Doe's identification of Williams was unreliable because she initially chose number 1 in the photographic lineup as her assailant and because Doe allegedly kept looking at the photographic lineup after she "didn't get any love from Deputy Alvarado" regarding her initial choice. The defense thus purposely used and relied on the same evidence Williams now claims should have been excluded to cast doubt on Doe's ability to identify her attacker as the *same* man who shot Henderson.

As such, and in light of the strong presumption defense counsel's conduct was within the wide range of reasonable professional assistance (see *Strickland v. Washington*, *supra*, 466 U.S. at p. 689), for this separate and independent reason we conclude Williams cannot establish that defense counsel was ineffective in failing to move to exclude Doe's photographic lineup testimony. (See *People v. Stanley* (2006) 39 Cal.4th 913, 954 [noting the general rule that reviewing courts ""accord great deference to counsel's tactical decisions"" and thus ""should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight""].)

D. *Prejudice*

Finally, even assuming defense counsel was ineffective in failing to move to exclude Doe's photographic lineup testimony, we conclude Williams cannot satisfy the second element of ineffective assistance of counsel and show prejudice resulting from counsel's failure. (See *People v. Vines*, *supra*, 51 Cal.4th at pp. 875-876.) As noted, prejudice is shown """when there is a "reasonable probability that, but for counsel's

17

unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"'" (*Id.* at p. 876.)

Here, even *if* defense counsel had moved to exclude the testimony of Doe regarding the photographic lineup and even *if* the court had exercised its discretion and ruled to exclude such testimony, we conclude there is not a reasonable probability the outcome of Williams's conviction on counts 1 and 2 would have been different. Although Williams on appeal contends Doe's pretrial photographic identification was the "only evidence" tying him to counts 1 and 2, as noted *ante*, the record belies this contention because Doe repeatedly identified her attacker as the *same* man who attacked Henderson, and there is absolutely no dispute that this *same* man—Williams—shot Henderson. Thus, in light of the independent evidence corroborating Doe's identification of Williams as the *same* man who robbed and sexually assaulted her and shot Henderson, we conclude that even without the evidence of the photographic lineup there is not a reasonable probability the outcome in counts 1 and 2 would have been different.

## DISPOSITION

The judgment of conviction is affirmed.

BENKE, Acting P. J.

WE CONCUR:

HUFFMAN, J.

McDONALD, J.

18